UNITED STATES of America,
Plaintiff-Appellee,

v.

Cornelius J. KEHOE and Ray K.
Bullock, Defendants-Appellants.

No. 76–4346.

United States Court of Appeals,
Fifth Circuit.

May 22, 1978.

James J. Hippard, Houston, Tex., for Kehoe.

Randy L. Schaffer, Jr., Houston, Tex., for Bullock.

J. A. Canales, U. S. Atty., Mary L. Sinderson, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before GOLDBERG and MORGAN, Circuit Judges, and WYZANSKI, District Judge.*

LEWIS R. MORGAN, Circuit Judge:

Defendants Kehoe and Bullock allege several errors that they argue require reversal of their conviction for violation of 18 U.S.C. § 1006.[1] The facts allegedly consti-

---

* Senior Judge for the District of Massachusetts, sitting by designation.

1. 18 U.S.C. § 1006 states:

Whoever, being an officer, agent or employee of or connected in any capacity with the Reconstruction Finance Corporation, Federal Deposit Insurance Corporation, National Credit Union Administration, Home Owners' Loan Corporation, Farm Credit Administration, Department of Housing and Urban Development, Federal Crop Insurance Corporation, Farmers' Home Corporation, the Secretary of Agriculture acting through the Farmers' Home Administration, or any land bank, intermediate credit bank, bank for cooperatives or any lending, mortgage, insurance, credit or savings and loan corporation

tuting this criminal violation are extremely complex. From 1969–1971, defendants Bullock and Kehoe were directors of the Surety Savings Association, a federally insured corporation. Surety owned a 7.2 acre tract of land in Houston on which it wanted to build an office building, but state savings and loan regulations limited the amount of money that such institutions could invest in office real estate and, therefore, these regulations prevented Surety from developing the property. Consequently, the directors of Surety formed "Fondren Square," a limited partnership, to do that which Surety could not do: develop the property. Kehoe and Bullock were general partners in Fondren (both together held a 52% interest in the partnership) with five limited partners. Surety divided the 7.2 acre tract into two sections: a 2.5 acre tract [hereinafter referred to as Phase I] and a 4.7 acre tract [hereinafter called Phase II]. Surety then conveyed Phase I to Fondren Square for a profit of $28,000, after which the latter built an office building and shopping center on the property. When the parking lot for this Phase I property was paved, however, .3 acre of Phase II, mistakenly thought to be part of Phase I, was also paved. This .3 acre figures prominently in the alleged criminal activity.

At this point Trans-Houston Corporation enters the picture. Trans-Houston was a wholly-owned subsidiary of Surety, chartered as a separate corporation and intended to act as an investment vehicle for real property. In September, 1969 Surety transferred the Phase II property to Trans-Houston at cost in exchange for $395,000 in Trans-Houston stock. Surety intended Trans-Houston to enter a joint venture with Fondren Square on the Phase II tract, with Trans-Houston supplying the property and Fondren assuming all liabilities for developing the property. In November, 1969, Surety made an entry in its books transferring Phase II from it asset column to the account of Trans-Houston; the latter made the same notation in its books. Title, however, was never formally deeded to Trans-Houston. Of course, the .3 acre discussed above was included in this Phase II property, although all parties presumably thought that it was part of Phase I.

By 1970, Phase I was losing money and the Fondren partners decided to sell it. A real estate broker advised them that Phase I was not very attractive unless the undeveloped Phase II property could be sold with it. Fondren consulted with its joint venturer Trans-Houston, who decided that it would be more profitable to sell Phase II than to expend more money developing it. Thus, both phases were to be sold together.

A problem in selling the property existed, however, with regard to Phase I. That is, Phase I and another property [Hedwig property] owned by Fondren were the subjects of a cross-collateral agreement that ran in favor of Gibralter Savings and Loan Association. This meant that if a buyer bought one of the two properties [Hedwig or Phase I], his property would still be

or association authorized or acting under the laws of the United States or any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation, or by the Administrator of the National Credit Union Administration, or any small business investment company, with intent to defraud any such institution or any other company, body politic or corporate, or any individual, or to deceive any officer, auditor, examiner or agent of any such institution or of department or agency of the United States, makes any false entry in any book, report or statement of or to any such institution, or without being duly authorized, draws any order or bill of exchange, makes any exceptance, or issues, puts forth or signs any note, debenture, bond or other obligation, or draft, bill of exchange, mortgage, judgment, or decree, or, with intent to defraud the United States or any agency thereof, or any corporation, institution, or association referred to in this section, participates or shares in or receives directly or indirectly any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such corporation, institution, or association, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

encumbered by the debts of the other. Obviously, this cross-collateral agreement impaired the marketability of Phase I. To alleviate this problem, Fondren got Gibralter to release the two properties—Phase I and Hedwig—from the cross-collateral agreement in return for a $35,000 note executed by the limited partnership. Defendants Kehoe and Bullock signed the note individually and as general partners.

With the Phase I and Phase II properties now marketable, the real estate agent found a buyer, Triton Ventures. Triton Ventures offered to buy Phase I and take a one year option to buy Phase II. Yet, upon viewing a survey plat of the entire tract, Triton discovered that the .3 acre thought to belong to Fondren Square in Phase I was actually a part of Phase II. Triton insisted, however, that the .3 acre be included in the Phase I conveyance since it would need this area for parking at Phase I. Fondren agreed to this and in March, 1971, Fondren and Triton entered into an earnest money contract whereby Triton was to acquire Phase I and the .3 acre by paying $35,000 in cash, assuming the $900,000 note owed by Fondren on the property, and by assuming the $35,000 note owed by Fondren and defendants to Gibralter. In addition, Triton had an option to buy Phase II. The earnest money contract was signed by Kehoe and Bullock on behalf of Fondren Square. Surety, which still held the deed on Phase II, deeded the .3 acre to Triton, with Kehoe signing for Surety. Triton gave back Kehoe a deed of trust on the .3 acre to secure payment of the note to Gibralter. Thus, if Triton did not pay the $35,000 note, it would lose the .3 acre which would revert to Gibralter Savings and Loan Association.

The contentions advanced by the Government at trial were that Surety owned the .3 acre in question.[2] Yet, Surety received no compensation for the .3 acre in that this .3 acre was conveyed to Triton in return for

Triton paying off a note owed to Gibralter by Fondren and, in particular, by Kehoe and Bullock, Fondren's general partners. Accordingly, the Government contended that Kehoe, by making the unauthorized conveyance, and Bullock, by aiding and abetting in this transaction, fraudulently reaped the benefit on a sale of property that was owned by a federally insured institution. Further, the Government contended that since the minutes of Surety and Trans-Houston were silent as to the deed from Surety to Triton for the .3 acre, this meant that the Surety Board of Directors did not know of the conveyance. Accordingly, Kehoe's signature was an unauthorized conveyance made with the intent to defraud the federally insured institution and, thus, a violation of 18 U.S.C. § 1006. The Government further contended that Bullock aided and abetted this fraudulent conveyance.

■ We have no difficulty rejecting defendants' allegations of error concerning the merits of the conviction, itself. First, defendants argue that, even assuming they committed the acts enumerated by the Government, the jurisdictional limits of 18 U.S.C. § 1006 prevent conviction. That is, defendants contend that if they defrauded anyone through their receipt of the $35,000 note from Triton Ventures it was Trans-Houston Corporation, the owner of the .3 acre in question and an entity not protected by § 1006. Thus, while defendants concede that record title of the .3 acre remained with Surety, they argue that Trans-Houston held equitable title, which under Texas law gives one "the present right to legal title."[3] Without exploring Texas real property law, we deem it sufficient that record title, no matter how inferior it is to equitable title, contains some value, of which value defendants' dealings with Trans-Houston deprived Surety, an entity covered by § 1006. Even assuming that

2. While all of Phase II, including the .3 acre were on Trans-Houston's books, the Government contends that the deed was kept by Surety and, thus, was its property.

3. Defendants cite *Pegues v. Moss,* 140 S.W.2d 461 (Tex.Civ.App.1940) for this proposition and opine that Texas statutory law, Tex.Rev.Civ. Stat.Ann. art. 7425b–5 (1960), also "strongly suggests" this result.

Trans-Houston bore all title to the land, we cannot ignore the fact that Surety owned one hundred percent of Trans-Houston's stock or that the 4.7 acres of land were the latter's sole asset. Congress intended that § 1006, in accordance with the maxim that a servant cannot serve two masters, should prohibit a conflict of interests situation such as that which occurred here. *See Beaudine v. United States,* 368 F.2d 417 (5th Cir. 1966). Accordingly, it is difficult to assail the Government's contention that defendants contravened § 1006 because, by diminishing the value of Trans-Houston's sole asset, the defendants were necessarily decreasing the value of its stock and, accordingly, the value of a Surety asset.

■ Defendants cite *Cartwright v. United States,* 146 F.2d 133 (5th Cir. 1944) in rebuttal of the Government's position on this issue. In *Cartwright,* the Government sought to convict the defendant for a violation of what was then 18 U.S.C. § 82, which made illegal the theft of any property of the United States Government *or* of a corporation in which the United States owned stock. The Government had alleged in the indictment that the defendant stole property owned by the Government, although its evidence at trial indicated that the stolen property was owned by a corporation in which the United States owned stock. This court held that the Government having chosen to allege in the indictment that the stolen property was owned by the United States, itself, could not discharge its burden of proof by showing that another entity owned the property. *Cartwright v. United States,* 146 F.2d at 135. Clearly then *Cartwright* does not in any way support defendants' argument that Trans-Houston Corporation's alleged "equitable" ownership of the .3 acre deprives § 1006 of jurisdiction over the conduct in question. *Cartwright* is potentially significant for this case only through its disapproval of the introduction of evidence that varies from that evidence anticipated by the indictment. Yet, even on this limited ground, *Cartwright* is distinguishable from the present case. In this case the indictment charged that defendants "conveyed three-tenths (³⁄₁₀) of an acre of land belonging to and in the care, custody and control of Surety Savings Association." [4] Therefore, one could argue first that the allegations contained in the indictment did not vary from those proved at trial. That is, the indictment stated that the property in question was "in the care, custody, and control of Surety." Indeed, the Government proved that allegation at trial through its evidence showing that Surety owned all of Trans-Houston's stock and, thus, had effective control over disposition of the latter's assets. Of course, defendants would argue that the indictment also stated that the .3 acre "belonged" to Surety and that, accordingly, the evidence at trial varied from their allegation because it showed that the property "belonged" to Trans-Houston. One answer to that contention is that no matter what equitable interest Trans-Houston possessed, Surety still held record title to the property and, thus, its authorization was necessary, and indeed was sought in this case, to pass the title to Triton. Accordingly, the Government was not totally inaccurate in ascribing ownership of the property to Surety in its indictment. At any rate, even assuming a variance between the charge and proof, this court does not deem such a variance fatal unless it appears that this variance deprived the defendant of fair notice sufficient to enable him to prepare his defense. *United States v. Eaton,* 501 F.2d 77 (5th Cir. 1974); *United States v. Lambert,* 501 F.2d 943 (5th Cir. 1974), vacating 470 F.2d 354 (5th Cir. 1972). Clearly, any variance in this case does not meet that test.

■ Defendants Bullock and Kehoe also argue that the evidence was insufficient to justify their conviction. We have examined the record and find that the Government introduced adequate evidence of defendants' guilt to uphold their convictions. In addition, we consider without merit defendant Bullock's contention that § 1006 is unconstitutionally vague. Like-

4. R. p. 302.

wise, we reject Bullock's claim that the indictment was insufficiently specific with respect to the description of the land conveyed and the benefits received. Fed.R. Crim.P. 7(c)(1) states that an indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." The ·Government met that standard here.

Defendants' most troublesome argument in this case concerns the double jeopardy implication present in their prosecution. That is, the Government first tried defendants under an indictment charging violation of 18 U.S.C. § 657,[5] which makes illegal the embezzlement of money and "other things of value" from institutions insured by the Federal Savings and Loan Insurance Corporation. After a jury had been empanelled and the Government had prosecuted its case in chief, the defendants moved for a judgment of acquittal on the ground that the indictment failed to charge an offense against the laws of the United States; specifically, they argued that real property cannot be embezzled under the provisions of 18 U.S.C. § 657. The district court judge, Judge Bue, granted defendants' motion, holding that the term "embezzlement" can apply only to personal property. Shortly thereafter the Government obtained a new indictment against the defendants for the same transaction presented in the first trial; this indictment charged violation of 18 U.S.C. § 1006. Prior to trial, defendants moved to dismiss the indictment, arguing that a second trial arising out of the same transaction would place them in double jeopardy. Judge Seals, the district court judge for this second indictment, granted the motion. Pursuant to 18 U.S.C. § 3731,[6]

---

5. 18 U.S.C. § 657 states:

Whoever, being an officer, agent or employee of or connected in any capacity with the Reconstruction Finance Corporation, Federal Deposit Insurance Corporation, National Credit Union Administration, Home Owners' Loan Corporation, Farm Credit Administration, Department of Housing and Urban Development, Federal Crop Insurance Corporation, Farmers' Home Corporation, the Secretary of Agriculture acting through the Farmers' Home Administration, or any land bank, intermediate credit bank, bank for cooperatives or any lending, mortgage, insurance, credit or savings and loan corporation or association authorized or acting under the laws of the United States or any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation or by the Administrator of the National Credit Union Administration or any small business investment company, and whoever, being a receiver of any such institution, or agent or employee of the receiver, embezzles, abstracts, purloins or willfully misapplies any moneys, funds, credits, securities or other things of value belonging to such institution, or pledged or otherwise intrusted to its care, shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount or value embezzled, abstracted, purloined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

6. 18 U.S.C. § 3731 states:

An appeal may be taken by and on behalf of the United States from the district courts direct to the Supreme Court of the United States in all criminal cases in the following instances:

From a decision or judgment setting aside, or dismissing any indictment or information, or any count thereof, where such decision or judgment is based upon the invalidity or construction of the statute upon which the indictment or information is founded.

From a decision arresting a judgment of conviction for insufficiency of the indictment or information, where such decision is based upon the invalidity or construction of the statute upon which the indictment or information is founded.

From the decision or judgment sustaining a motion in bar, when the defendant has not been put in jeopardy.

An appeal may be taken by and on behalf of the United States from the district courts to a court of appeals in all criminal cases, in the following instances:

From a decision or judgment setting aside, or dismissing any indictment or information, or any count thereof except where a direct appeal to the Supreme Court of the United States is provided by this section.

From a decision arresting a judgment of conviction except where a direct appeal to the Supreme Court of the United States is provided by this section.

From an order, granting a motion for return of seized property or a motion to suppress evidence, made before the trial of a person charged with a violation of any law of the United States, if the United States attorney certifies to the judge who granted such motion that the appeal is not taken for purpose of delay and that the evidence is a

the Government appealed the dismissal and a panel of this court, holding that a trial for the § 1006 violation would not contravene the Double Jeopardy Clause, reversed the district court order dismissing the second indictment. *See United States v. Kehoe,* 516 F.2d 78 (5th Cir. 1975), *cert. denied,* 424 U.S. 909, 96 S.Ct. 1103, 47 L.Ed.2d 313 (1976). Subsequently, defendants were tried under this second indictment and convicted of violating § 1006; it is this conviction that is the subject of the present appeal.

■ One of defendants' major contentions upon this appeal is that, in a light of a recent Supreme Court opinion, *Finch v. United States,* 433 U.S. 676, 97 S.Ct. 2909, 53 L.Ed.2d 1048 (1977), the prior panel's ruling on the double jeopardy issue is now erroneous and that, accordingly, this panel should affirm Judge Seals' dismissal of the second indictment. In this court an opinion in a case becomes the "law of the case" and will not be overturned by a panel in a later appeal on the same issue in the same case unless it is shown to be clearly erroneous and to work a manifest injustice. *United States v. Bedami,* 539 F.2d 440 (5th Cir. 1976); *United States v. Seiffert,* 501 F.2d 974 (5th Cir. 1974). We agree with defendants that *Finch* and another recent Supreme Court case, *Lee v. United States,* 432 U.S. 23, 97 S.Ct. 2141, 53 L.Ed.2d 80 (1977), do alter the analysis used by the first *Kehoe* panel; we do not agree, however, that these Supreme Court cases necessarily change the result in this case.

To explicate why we have reached this conclusion, a review of the first *Kehoe* opinion and relevant Supreme Court case law is appropriate. That panel's holding was based primarily on its "believe that a defendant who for reasons of trial tactics delays until mid-trial a challenge to the indictment that could have been made before the trial—and before jeopardy has attached—is not entitled to claim the protection of the double jeopardy clause when his objections to the indictment are sustained." 516 F.2d at 86. In reaching this determination, the panel examined recent Supreme Court pronouncements. It observed that at first glance *United States v. Jenkins,* 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975) seemed to pose an obstacle to retrial of defendants through its holding that the Double Jeopardy Clause precludes an appeal of a trial court's order, entered before a finding of guilt or innocence, that discharges a defendant based on the judge's determination that he or she cannot be convicted of the offense charged.[7] The panel

substantial proof of the charge pending against the defendant.

The appeal in all such cases shall be taken within thirty days after the decision or judgment has been rendered and shall be diligently prosecuted.

Pending the prosecution and determination of the appeal in the foregoing instances, the defendant shall be released in accordance with chapter 207 of this title.

If an appeal shall be taken, pursuant to this section, to the Supreme Court of the United States which, in the opinion of that Court, should have been taken to a court of appeals, the Supreme Court shall remand the case to the court of appeals, which shall then have jurisdiction to hear and determine the same as if the appeal had been taken to that court in the first instance.

If an appeal shall be taken pursuant to this section to any court of appeals which, in the opinion of such court, should have been taken directly to the Supreme Court of the United States, such court shall certify the case to the Supreme Court of the United States, which shall thereupon have jurisdiction to hear and determine the case to the same extent as if an appeal had been taken directly to that Court.

7. In *Jenkins,* the district court, after hearing the evidence in a bench trial, dismissed an indictment charging refusal to submit to induction into the armed services. Under the law of the Second Circuit at the time of the offense, the induction order was improper and, accordingly, a person could not be convicted for refusing to submit to it. A subsequent decision, announced by the Second Circuit after the offense but before Jenkins had been charged with the crime, would allow conviction for refusal to submit to such an order. The district court reasoned, however, that retroactive application of the intervening decision would be unfair. For this reason, and without entering any finding of guilt or innocence, the court dismissed the indictment. *United States v. Jenkins,* 349 F.Supp. 1068 (E.D.N.Y.1972). Ruling upon the issue of whether the Government could appeal this order of dismissal, the Supreme Court held that such an appeal would violate the Double

noted, however, that *Serfass v. United States*, 420 U.S. 377, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975), decided on the same day as *Jenkins,* limited the seemingly broad rule announced in *Jenkins.* For the panel, the significance of *Serfass* lay in the Supreme Court's reservation of two questions that otherwise would have fallen directly within the *Jenkins* rule. The reserved question pertinent to this case concerned whether appeal would be barred from a mid-trial ruling discharging the defendant on a legal ground that could have been raised by the defendant before trial. *See United States v. Kehoe, supra,* 516 F.2d at 84. Thus, interpreting *Jenkins* as a narrow holding limited to its facts, the panel held that it was not applicable to the case before it. Further, discovering no Supreme Court case on point, the panel determined that *Illinois v. Somerville,* 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973) was most analogous to the present case. In *Somerville,* the trial judge declared a mistrial when the prosecution discovered, after jeopardy had attached, that the indictment contained an incurable jurisdictional defect; the Supreme Court held that "where the declaration of a mistrial implements a reasonable state policy and aborts a proceeding that at best would have produced a verdict that could have been upset at will by one of the parties, the defendant's interest in proceeding to verdict is outweighed by the competing and equally legitimate demand for public justice." 410 U.S. at 471, 93 S.Ct. at 1074, 35 L.Ed.2d at 435. Accordingly, holding that despite the different terminology used to abort the first trial in *Somerville* and in the instant case, the effect was the same in both, the panel employed the interest-balancing approach used in *Somerville* and permitted a second prosecution. 516 F.2d at 85. In short, the panel having reasoned that *Jenkins,* limited by *Serfass,* did not control, it analyzed the dismissal as a mistrial and because this mistrial implemented a "reasonable state policy," it permitted a second prosecution.[8]

Defendants now contend that *Finch v. United States,* 433 U.S. 676, 97 S.Ct. 2909, 53 L.Ed.2d 1048 (1977), decided after *Kehoe,* changes the result in the latter case. As noted above, we believe that *Lee v. United States,* 432 U.S. 23, 97 S.Ct. 2141, 53 L.Ed.2d 80 (1977) and *Finch v. United States,* 433 U.S. 676, 97 S.Ct. 2909, 53 L.Ed.2d 1048 (1977), alter the reasoning employed by this court in its original opinion on this question. That is, in this case the Government did not appeal the district court's dismissal of the indictment charging a § 657 violation. Rather, it brought a new indictment charging a violation of § 1006. The first *Kehoe* panel decided the case under the assumption that the result on the double jeopardy issue would be the same whether the Government has appealed the § 657 dismissal or, as actually happened, had brought an indictment under another statute. Accordingly, it analyzed the case as if the Government were appealing the dismissal of the § 657 indictment and seeking a retrial on that charge should its appeal be successful. *See Kehoe,* 516 F.2d at 81 n.4 and at 84 n.8. Yet, *Lee* and *Finch* clearly indicate that the Double Jeopardy Clause would prevent an appeal of the original indictment charging a violation of § 657. In *Finch,* the Government charged the defendant with knowingly fishing on a portion of a river reserved for use by the

Jeopardy Clause. The Court reasoned that the proceedings in the trial court had terminated in the defendant's favor and, consequently, a Government appeal that, if successful, would require another trial to determine factual issues relating to the elements of the charge would violate the Double Jeopardy Clause. *United States v. Jenkins,* 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975).

**8.** Assuming that the dismissal could have been analyzed as a mistrial, see discussion, *infra,* at pp. 342–345, the panel's conclusion that a second trial would not be prohibited by the Double Jeopardy Clause, was ratified by the Supreme Court in *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). In *Dinitz,* the Court held that when a defendant successfully moves for a mistrial and the error that necessitates the mistrial is not attributable to prosecutorial or judicial bad faith or overreaching, a second trial for the same offense does not contravene the Double Jeopardy Clause. *Dinitz,* 424 U.S. at 607, 96 S.Ct. 1075.

Crow Indians in violation of 18 U.S.C. § 1165. The district court reviewed the applicable treaties and dismissed the information for failure to state an offense under the statute in that the relevant treaties indicated that the land on which the defendant was fishing was not held by an Indian group. The Supreme Court held that the Double Jeopardy Clause prevented the Government from appealing the dismissal "[b]ecause the dismissal was granted prior to any declaration of guilt or innocence, 'on the ground, correct or not, that the defendant simply cannot be convicted of the offense charged.'" *Finch*, 433 U.S. at 677, 97 S.Ct. at 2910, 53 L.Ed.2d at 1051, citing *Lee v. United States*, 432 U.S. at 23, 97 S.Ct. at 2141, 53 L.Ed.2d at 80.

*Lee* is significant for this case because of its explication of the *Jenkins* holding. In *Lee*, the defendant had been charged with theft of some wallets in a United States Post Office in violation of the Assimilative Crimes Act, 18 U.S.C. § 13. Immediately before trial, the defense counsel moved to dismiss the indictment as defective in that an essential element of the offense—the intent to steal—was omitted from the indictment. Because the court had had no prior opportunity to consider the motion, it began the bench trial, reserving its decision on the motion. After both the prosecution and the defense had rested, the court ruled that although the defendant's guilt had been proven beyond a reasonable doubt, it found the indictment defective and granted the motion to dismiss. In analyzing the Double Jeopardy Claim, the Supreme Court reexamined *Jenkins, supra,* and reemphasized the importance of the distinction drawn between a mistrial and a dismissal. In *Jenkins,* the Court had stated that it was of critical importance to its determination that Jenkins could not be retried that the proceeding in the trial court had terminated in the defendant's favor rather than in a mistrial. *Lee v. United States,* 432 U.S. at 30, 97 S.Ct. at 2146, 53 L.Ed.2d 80. The Court noted that

> [t]he distinction drawn by *Jenkins* does not turn on whether the District Court labels its action a 'dismissal' or a 'declaration of mistrial.' *The critical question is whether the order contemplates an end to all prosecution of the defendant for the offense charged.* A mistrial ruling invariably rests on grounds consistent with reprosecution, . . . while a dismissal may or may not do so. *Where a midtrial dismissal is granted on the ground, correct or not, that the defendant simply cannot be convicted of the offense charged, Jenkins* establishes that further prosecution is barred by the Double Jeopardy Clause.

432 U.S. at 30, 97 S.Ct. at 2146, 53 L.Ed.2d at 87 (emphasis added). Applying this standard to the case before it, the Court held that

> the proceedings against Lee cannot be said to have terminated in his favor. The dismissal clearly was not predicated on any judgment that Lee could never be prosecuted or convicted for the theft of the two wallets. To the contrary, the District Court stressed that the only obstacle to a conviction was that the fact that the information had been drawn improperly. The error, like any prosecutorial or judicial error that necessitates a mistrial, was one that could be avoided—absent any double jeopardy bar—by beginning anew the prosecution of the defendant. And there can be a little doubt that the court granted the motion to dismiss in this case in contemplation of just such a second prosecution. In short, the order entered by the District Court was functionally indistinguishable from a declaration of mistrial.

*Lee,* 432 U.S. at 30, 97 S.Ct. at 2146, 53 L.Ed.2d at 87 (footnote omitted). Having determined that this proceeding had ended in a mistrial, the Court applied the rule articulated in *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267,[9] and held that the defendant having made the motion for a mistrial, he is estopped from claiming the protections of the Double

---

9. See n.8, *supra.*

Jeopardy Clause in a subsequent trial for the same offense.

■ In the present case, the district court clearly did not intend its dismissal of the § 657 indictment as a declaration of mistrial. The error that necessitated the court's dismissal was not a simple defect in the indictment that, as in *Lee,* could be cured by redrawing the instrument to include an essential element that was omitted in the first indictment. Rather the order of dismissal was grounded on the court's determination that the Government's theory of the case—that real property can be embezzled or misapplied under § 657—could never be proved by any set of facts nor by any amendment of the indictment; its indictment quite simply stated no offense prohibited by § 657. Unlike the order in *Lee,* the district court's order here contemplated no second prosecution for this § 657 offense.[10] Accordingly, the order of dismissal did constitute a termination of the proceedings in the defendant's favor and a determination by the district court, whether correct or not, that the "defendant simply [could] not be convicted of the offense charged."

Therefore, because we conclude that the district court's order of dismissal should be considered as a dismissal, not as a mistrial, under the *Jenkins* test, we do not consider the second part of the *Lee* opinion, relating to the defendant's "waiver" of his right to object to a second trial if he requested the mistrial and if neither the Government nor the court has acted in bad faith. That is,

the Government argues that *Lee* is helpful to their argument in that it holds that whenever a defendant exercises a choice in favor of termination, rather than continuation, of the trial, *Dinitz* principles[11] control and the defendant is estopped from objecting to a second trial. The Government ignores, however, the Supreme Court's insistence that one must first find that the district court's termination of the case constitutes a declaration of mistrial, before one can apply this *Dinitz* waiver-like concept. Here, as discussed above, it is clear that the district court did not intend its order of dismissal as a mistrial. Accordingly, it is irrelevant that the defendant requested the dismissal.

■ Similarly, the Government might argue that conceding the above discussion to be correct, *Lee* does not alter this court's first opinion in this case under the "clearly erroneous" standard in that the basis for the panel's decision—that one who for reasons of trial tactics delays until mid-trial a challenge to the indictment that could have been made before jeopardy attached—was not touched upon by the Supreme Court in *Lee.* It is true that the Court did not address this precise question in *Lee.* Nevertheless, its discussion of the *Jenkins* decision indicates that the timing of the defendant's motion to dismiss is not the threshold question. That is, in *Lee,* the defendant delayed making a challenge of the indictment that could have been made before trial until after jeopardy had attached.[12] The Court's first question, how-

10. The Government argues that, as in *Lee,* the order of dismissal here did not contemplate that defendants Kehoe and Bullock could not be convicted of some offense, although not 18 U.S.C. § 657. Yet, in *Lee,* the court's mid-trial dismissal was labeled a mistrial because the court anticipated reprosecution for the same offense charged in the indictment that was being dismissed there. In this case, the district court clearly did not envision reprosecution for the § 657 charge as a result of its dismissal. Even if the court expected retrial of defendants for some other offense—and that is nowhere indicated in its order—that expectation in no way negates the court's determination that defendant could not be convicted for a § 657 violation. Indeed, in *Finch v. United States,*

433 U.S. 676, 97 S.Ct. 2909, 53 L.Ed.2d 1048, discussed *supra* at 4324, the district court dismissed an information that charged a violation of 18 U.S.C. § 1165 as failing to state an offense. The Supreme Court held that the Double Jeopardy Clause prevented an appeal of this dismissal. Thus, simply because the district court's dismissal did not preclude another prosecution under another statute for the same conduct did not alter the Government's inability to appeal the dismissal itself.

11. See n.8.

12. In *Lee,* defendant made his motion to dismiss immediately before the trial began. Nevertheless, after determining that the court's

ever, was whether the termination of the trial envisioned a second prosecution for the offense after the defective indictment had been corrected or whether the dismissal was grounded instead on the conclusion, correct or not, that the defendant simply could not be convicted of the offense charged. Clearly, had the Court found that the case had finally ended in Lee's favor, it would not have considered probative the failure of Lee to make the motion to dismiss until after jeopardy had attached.

Having determined that *Lee* and *Finch* would prevent the Government's appeal of the dismissal of the § 657 indictment, the validity of the Government's subsequent prosecution of the § 1006 charge must be ·determined by applying the traditional tests employed to decide whether the same conduct can justify prosecution under two separate statutes. In order to determine whether a given act can be tried as a violation of two separate statutes we employ the "different evidence" test formulated by the Supreme Court in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). That is, if each statute requires proof of a fact and element that the other statute does not require, then successive trials of a person for conduct allegedly violating both statutes does not violate the Double Jeopardy Clause. *Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); *United States v. Ewell,* 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627; *United States v. Hill,* 500 F.2d 733 (5th Cir. 1974). *United States v. Costello,* 483 F.2d 1366 (5th Cir. 1973); *United States v. Young,* 482 F.2d 993 (5th Cir. 1973); *Hattaway v. United States,* 399 F.2d 431 (5th Cir. 1968). In applying this standard, however, we are mindful that this is not a standard of mathematic precision. In *Brown, supra,* the Supreme Court recognized this limitation: "It has long been understood that separate statutory crimes need not be identical—either in constituent elements or in actual proof—in order to be the same within the meaning of the constitutional prohibition." 432 U.S. at 164, 97 S.Ct. at 2224, 53 L.Ed. at 187. The statutes themselves are the prime sources for this analysis. By first resolving the statutes into their constituent elements, and then comparing the elements, along with their probable judicial glosses, the double jeopardy issue may be analyzed.

 Resolved into its elements § 657 provides:

(1) Whoever, being an officer . . . of . . . any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation

(2) embezzles, abstracts, or willfully misapplies

(3) any moneys, funds, credits, securities, or other things of value belonging to such institution,

shall be fined or imprisoned or both. In the same fashion, § 1006 contains the following four elements:

(1) Whoever, being an officer . . . of . . . any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation

(2) with intent to defraud the . . institution receives directly or indirectly

(3) any money, profit, property, or benefits

(4) through any transaction, loan, commission, contract, or any other act of any such . . . institution,

shall be fined or imprisoned or both. Even though the sections employ different language, we are persuaded that both statutes proscribe the same conduct with the exception of the § 1006 requirement that an act of the institution be involved. The first and third elements of both are nearly identical. The second elements, the scienter requirements, although employing different language, are broad enough to be construed

---

dismissal was indeed a mistrial, the Supreme Court deemed the defendant's motion to dismiss as having been made after jeopardy had attached, in that the defense counsel gave the court little opportunity to consider the motion before jeopardy had attached, he made no effort to withdraw the motion after jeopardy had attached, and he offered no objection to the termination of the proceedings before a finding of guilt or innocence had been entered. *Lee v. United States,* 432 U.S. 23, 33, 97 S.Ct. 2141, 2147, 53 L.Ed.2d 80, 89 (1977).

to proscribe the same peculations. Although § 1006's fourth element has no analog in § 657, the *Blockburger* test is not thereby satisfied because *each* statute must contain an element that the other does not and Section 657 contains no element not present in § 1006. We therefore, hold that § 657 and § 1006, although not identical because of the § 1006 "act of the institution" requirement, are sufficiently similar that successive prosecutions under the statute offend the constitutional prohibition against double jeopardy.

REVERSED.