**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Ronald C. BRECHTEL and Phillip H. Gattuso, Defendants–Appellants.**

**No. 92–3342.**

United States Court of Appeals,
Fifth Circuit.

Aug. 2, 1993.

Rehearing Denied Sept. 21, 1993.

Frank G. DeSalvo, New Orleans, LA, for Ronald C. Brechtel.

Patrick Fanning, New Orleans, LA, for Phillip H. Gattuso.

Peter Strasser, Herbert W. Mondros, Asst. U.S. Attys., and Harry Rosenberg, U.S. Atty., New Orleans, LA, for the U.S.

Before POLITZ, Chief Judge, KING and DUHÉ, Circuit Judges.

PER CURIAM:

Ronald Brechtel and Phillip Gattuso appeal their convictions of unlawful participation in benefits from savings and loan transactions, in violation of 18 U.S.C. §§ 2, 1006. Finding no reversible error in either Brechtel's or Gattuso's convictions, we affirm.

### Background

Brechtel and Gattuso served as directors of Enterprise Federal Savings & Loan (EFS & L). Brechtel also served as secretary of the board and as a member of the loan committee. In addition to their involvement with EFS & L, Brechtel and Gattuso had interests in the Saulet and Ames Farm partnerships, two real estate development concerns owning land in Jefferson Parish, Louisiana. Gattuso's cousin Roy Gattuso managed those partnerships.

In 1984 and 1985, Gattuso executed documents by which Saulet and Ames Farm granted options on parcels of land. Stavros Amitsis, holder of the Saulet option, had exhausted his credit line and could not secure financing at EFS & L to purchase this property. Nikitas Pepis and Lynn Yao—two Amitsis associates—sought EFS & L loans with which to purchase the Saulet and Ames Farm parcels. Marilyn Ortalano, an EFS & L loan officer, informed the loan committee that if the loans were approved, Amitsis ultimately would receive the proceeds thereof. She also informed them that Robert Evans, EFS & L's board chairman, wanted the Yao and Pepis loans approved to keep Amitsis afloat. Brechtel urged the loan committee to approve the transactions.

On December 18, 1984, the $420,000 Pepis loan received committee approval. At a January 11, 1985 closing, Saulet sold its parcels to G & N Enterprises, a company recently

acquired from Amitsis by Paul Baltas and Lloyd Broussard. G & N paid Saulet $52,500 cash and executed a note for the balance of the $350,000 purchase price, securing the credit portion with a mortgage on the property. Brechtel and Gattuso both signed the instrument transferring the Saulet parcels to G & N. Later that day, as planned, Pepis took title to the parcels in a second closing and assumed the note executed by G & N. EFS & L received a second mortgage on the Saulet parcels as security for the Pepis loan. Six days later, the full EFS & L board approved the Pepis loan. Loan committee notes circulated at the board meeting reflected that the Saulet property secured that loan. Although board minutes for the January 17, 1985 meeting note the presence of Brechtel and Gattuso, the minutes reflect no disclosure by either of them of their interest in the Pepis transaction. Gattuso testified that he informed Evans of his and Brechtel's interest and that both abstained from the vote of approval.

In March 1985, the loan committee approved the $500,000 Yao transaction. The record contains no minutes reflecting approval of this loan by the full EFS & L board. On April 1, 1985, Yao took title to the Ames Farm parcel, giving in return cash and a note secured by the property. Brechtel and Gattuso attended that closing and signed the act of sale. EFS & L received a second mortgage on the Ames Farm property.

By 1986, Pepis and Yao were experiencing difficulty meeting their obligations under the Saulet and Ames Farm notes. On April 22, 1986, to avoid a foreclosure EFS & L purchased the first mortgage on the Saulet parcels. On April 29, 1986, Gattuso and Brechtel were advised by letter from Roy Gattuso of Yao's delinquency on the Ames Farm note and that Yao would seek to refinance his debt to the partnership through EFS & L. Roy Gattuso also advised that if Yao failed to obtain supplemental financing through EFS & L, foreclosure proceedings would be initiated. On June 19, 1986, the EFS & L board approved a $1.8 million loan permitting Yao to work out his financial problems. Brechtel, but not Gattuso, attended the June 19 meeting. Brechtel testified that he disclosed his and Gattuso's interest in the Yao loan and abstained from voting on it. The minutes from the June 19 meeting and the testimony of two other board members belie Brechtel's statement.

The grand jury indicted Brechtel and Gattuso on four counts of unlawful participation in benefits from savings and loan transactions, in violation of 18 U.S.C. §§ 2, 1006.[1] Counts one and two related to the initial loans by EFS & L to Pepis and Yao, respectively; count three to EFS & L's buyout of the Pepis mortgage, and count four to EFS & L's final loan to Yao. The district court denied motions by both Brechtel and Gattuso to dismiss counts of the indictment as multiplicitous. The jury acquitted Brechtel and found Gattuso guilty on count one, found both defendants guilty on counts two and four, and acquitted both defendants on count three. Brechtel and Gattuso unsuccessfully moved for judgment of acquittal and for new trial. The district court sentenced both defendants to one year of halfway house confinement, payment of incarceration costs and the statutory assessments, and restitution to

---

1. As applicable here, 18 U.S.C. § 1006 provides:

   [w]hoever, being an officer, agent or employee of or connected in any capacity with ... any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation[,] ... with intent to defraud the United States or ... any corporation, institution, or association referred to in this section, participates or shares in or receives directly or indirectly any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such corporation, institution, or association, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both.

The Crime Control Act of 1990, Pub.L. 101–647, § 2595(a)(4)(B), 104 Stat. 4907 (1990) substituted "institution, other than an insured bank (as defined in section 656), the accounts of which are insured by the Federal Deposit Insurance Corporation" for "institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation" in § 1006, reflecting absorption by the former agency of the latter. Congress also has amended the penalty provisions of § 1006 to provide for a maximum fine of $1,000,000 and a maximum prison term of 20 years. Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. 101–73, § 961(e), 103 Stat. 500 (1989).

the Resolution Trust Corporation. Brechtel and Gattuso timely appealed.

### Analysis

On appeal, both defendants challenge the sufficiency of the evidence and contend that the district court improperly permitted testimony regarding their violation of civil banking regulations. Brechtel further challenges the district court's refusal to: (1) dismiss counts of the indictment as multiplicitous, (2) permit his presentation of habit evidence, and (3) grant him a new trial. He also maintains that the statute of limitations barred his prosecution.

#### 1. Multiplicity

■ Brechtel first faults the district court's denial of his motion to dismiss portions of the indictment on multiplicity grounds. An indictment is multiplicitous if it charges a single offense in multiple counts,[2] thus raising the potential for multiple punishment for the same offense, implicating the fifth amendment double jeopardy clause.[3] Legislative intent typically is dispositive of the multiplicity inquiry. When considering an indictment charging separate offenses arising from a series of related acts, we must determine whether Congress intended separate punishments.[4] Where a defendant suffers convictions on multiplicitous counts, we must remand so that the government may dismiss improper charges and the trial court may resentence the defendant.[5] Like other determinations regarding double jeopardy, we review district court rulings on multiplicity claims *de novo*.[6]

■ Brechtel suggests that the two loans to Yao constituted individual steps in an overarching scheme to procure improper benefit from EFS & L through sale of the Ames Farm parcel. By charging the two Yao transactions as separate offenses, Brechtel argues that the government improperly splintered a single offense. He claims that in *United States v. Lemons*,[7] we found that multiplicity tainted an indictment under identical circumstances. We are not persuaded.

*Lemons* involved a bank-fraud prosecution under 18 U.S.C. § 1344. The indictment charged Lemons with separate violations of § 1344 for each of eight occasions on which he indirectly received or caused the bank to disburse funds. We noted that, although Lemons improperly received and caused disbursement of bank funds on several occasions, his acts constituted a single execution of a fraudulent scheme. We thus concluded, relying on the language of § 1344, that the indictment charged a single violation in multiple counts.

Because of the differences between 18 U.S.C. § 1006 and § 1344 *Lemons* is not dispositive of the case at bar. Rather than punishing "execut[ion] ... of a scheme or artifice to defraud," 18 U.S.C. § 1006 punishes bank officials who "receive[ ] ... any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of ... [the] institution." This language suggests intent to punish receipt of improper benefit from individual transactions, rather than from overarching schemes. Brechtel violated § 1006 each time he benefitted from an extension of credit to Yao. The district court properly rejected his contrary contention.

#### 2. Limitations Period

■ Brechtel next asserts that the five-year limitations period of 18 U.S.C. § 3282 bars his prosecution.[8] He urges that the ex

---

2. *E.g., United States v. Lemons*, 941 F.2d 309 (5th Cir.1991).

3. *E.g.,* id. (*citing United States v. Swaim*, 757 F.2d 1530 (5th Cir.), *cert. denied*, 474 U.S. 825, 106 S.Ct. 81, 88 L.Ed.2d 66 (1985)).

4. *See Missouri v. Hunter*, 459 U.S. 359, 365–69, 103 S.Ct. 673, 677–80, 74 L.Ed.2d 535 (1983) (where multiple punishments imposed in single prosecution, the double jeopardy inquiry is only whether legislature intended such multiple punishment).

5. *United States v. Heath*, 970 F.2d 1397 (5th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993); *Lemons*.

6. *See United States v. Vasquez–Rodriguez*, 978 F.2d 867 (5th Cir.1992).

7. 941 F.2d 309 (5th Cir.1991).

8. Section 3282 provides "Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the

post facto clause of Article I, § 9, cl. 3 of the Constitution [9] precludes application to him of the ten-year limitations period provided for by 18 U.S.C. § 3293.[10] This argument misperceives the law.

■ Recent Supreme Court teachings reject the proposition that retroactive legislation violates the ex post facto clause merely because it adversely affects the position of criminal defendants.[11] Rather, that clause prohibits only enactment of statutes which: (1) punish as a crime an act previously committed which was innocent when done; (2) make more burdensome the punishment for a crime, after its commission; or (3) deprive one charged with a crime of any defense available according to law at the time when the act was committed.[12] Only statutes withdrawing defenses related to the definition of the crime, or to the matters which a defendant might plead as justification or excuse fall within the latter group.[13] Plainly, extension of the limitations period neither criminalizes previously innocent conduct nor enhances the punishment for an existing crime. Further, while § 3293 deprives Brechtel of the five-year limitations period in effect when the questioned transactions occurred, it did not deprive him of a defense within the meaning of the ex post facto clause.[14] This contention lacks merit.

### 3. Habit Evidence

■ At trial, Brechtel sought to present testimony by his stock broker James Mangum. Through Mangum's testimony, Brechtel sought to establish that, as a matter of habit, he took an entirely passive role in his real estate and stock investments, permitting advisors to act on his behalf without inquiry into the substance of the transactions they proposed.[15] Mangum's testimony, Brechtel asserts, would have tended to negate the mental state required for conviction under § 1006 by demonstrating ignorance regarding his interests in the Ames Farm and Saulet parcels. The district court excluded Mangum's testimony under Fed.R.Evid. 403, finding any probative value it might have had

information is instituted within five years next after such offense shall have been committed."

**9.** That clause, regulating the authority of Congress, provides "No Bill of Attainder or ex post facto Law shall be passed."

**10.** Congress expressly indicated that § 3293, adopted August 9, 1989, would apply to offenses committed before and for which the limitations period had not run as of its enactment. Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. 101–73, § 961(*l*)(3), 103 Stat. 501 (1989).

**11.** *Collins v. Youngblood,* 497 U.S. 37, 50, 110 S.Ct. 2715, 2723, 111 L.Ed.2d 30 (1990).

**12.** Id. at 41, 110 S.Ct. at 2718 (*citing Beazell v. Ohio,* 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925)). Pre-*Youngblood* jurisprudence suggested that statutes retroactively prejudicing "substantial rights" of criminal defendants also might violate the ex post facto clause. *See, e.g., Miller v. Florida,* 482 U.S. 423, 433, 107 S.Ct. 2446, 2452, 96 L.Ed.2d 351 (1987); *Weaver v. Graham,* 450 U.S. 24, 29 n. 12, 101 S.Ct. 960, 964 n. 12, 67 L.Ed.2d 17 (1981). However, *Youngblood* makes clear that "substantial rights" language in earlier opinions does not expand the bases upon which a criminal defendant may premise an ex post facto challenge. Rather, only retroactive criminal statutes violating the principles set forth in *Beazell* and *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798), implicate "substantial rights"

for the purpose of ex post facto clause analysis. *Youngblood,* 497 U.S. at 46, 110 S.Ct. at 2721.

**13.** *Youngblood,* 497 U.S. at 49–50, 110 S.Ct. at 2723.

**14.** Our colleagues in other circuits have reached similar conclusions with regard to the retroactive application of § 3293. *United States v. Taliaferro,* 979 F.2d 1399 (10th Cir.1992); *United States v. Knipp,* 963 F.2d 839 (6th Cir.1992); *United States v. Madia,* 955 F.2d 538 (8th Cir.1992); *see also United States ex rel. Massarella v. Elrod,* 682 F.2d 688 (7th Cir.1982) (retroactive extension of unexpired limitations period does not violate ex post facto clause), *cert. denied,* 460 U.S. 1037, 103 S.Ct. 1426, 75 L.Ed.2d 787 (1983); *United States v. Richardson,* 512 F.2d 105 (3d Cir.1975) (same) (dictum); *Clements v. United States,* 266 F.2d 397 (9th Cir.) (same), *cert. denied,* 359 U.S. 985, 79 S.Ct. 943, 3 L.Ed.2d 934 (1959); *Falter v. United States,* 23 F.2d 420 (2d Cir.) (same) (L. Hand, J.), *cert. denied,* 277 U.S. 590, 48 S.Ct. 528, 72 L.Ed. 1003 (1928). Of course, the instant case requires no decision concerning the propriety of legislation reviving criminal liability after lapse of the previously applicable limitations period.

**15.** Brechtel concedes that Mangum did not advise him with regard to real estate investment. Brechtel sought to present Mangum's testimony as a substitute for that of real estate advisor Sam Gattuso, who died prior to trial.

substantially outweighed by its likely tendency to confuse jurors.[16]

Relying on our opinion in *United States v. Riley*,[17] Brechtel argues that the district court erred in refusing to permit Mangum's testimony. The defendant in *Riley*, indicted for misapplication of bank funds under 18 U.S.C. § 656, sought to introduce evidence that the institution routinely engaged in transactions similar to those underlying the charges against him. Because the trial court's exclusion of that evidence effectively prevented Riley from presenting his defense—that he believed the transactions proper and hence lacked fraudulent intent—we reversed the conviction. Brechtel contends that *Riley* mandates reversal in the instant case. We do not agree.

Mangum's proffered testimony did not involve Brechtel's business relationship with real estate advisor Sam Gattuso. Further, it involved Brechtel's standard operating procedure for stock transactions, which involve substantially less formality than the real estate transactions here at issue. Thus, Mangum's proffered testimony had at best tenuous relevance[18] and, even if relevant, would have had far less probative force than the evidence at issue in *Riley*. The chain of analogies required to ground relevance of this evidence might well have rendered it confusing to the jury. Well-settled rubrics consign rulings on admissibility of evidence to sound trial court discretion,[19] and require particular appellate court deference to rulings under Fed.R.Evid. 403 based on the risk of jury confusion.[20] While the discretion which district courts enjoy does not extend to the exclusion of crucial relevant evidence establishing a valid defense,[21] the questionable relevance, low probative value and potential for jury confusion presented by Mangum's testimony distinguish this case from *Riley* and persuade that its exclusion did not amount to an abuse of discretion.[22]

### 4. Evidence of Regulatory Violations

Both Brechtel and Gattuso claim that the district court erred in permitting testimony by Ronald Hall, an examiner with the Office of Thrift Supervision. Over defense objection, Hall testified that regulations require directors to disclose any interest they may have in transactions under consideration by the bank and abstain from deliberations concerning such transactions, and prohibit loans in which bank officials have an interest unless made directly to the official in question.[23] They argue that this testimony improperly suggested criminal liability flowing from a civil violation, and further improperly suggested the criminal intent required to convict them under § 1006. Mindful that an abuse of discretion standard governs our review of evidentiary rulings,[24] we find this argument lacks adequate persuasive force.

In *United States v. Christo*,[25] relied upon by Brechtel and Gattuso, we reviewed a prosecution for misapplication of bank funds in which the government presented evidence of

---

16. The district court, in the alternative, excluded Mangum's testimony as irrelevant because it related to stock rather than real estate transactions.

17. 550 F.2d 233 (5th Cir.1977).

18. *See United States v. Qaoud*, 777 F.2d 1105 (6th Cir.1985) (evidence regarding defendant judge's "general pattern" of refusing assistance to influence peddlers irrelevant and properly excluded in RICO prosecution where not crucial to defense), *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1499, 89 L.Ed.2d 899 (1986).

19. *E.g., United States v. Jimenez Lopez*, 873 F.2d 769 (5th Cir.1989).

20. *United States v. Allibhai*, 939 F.2d 244 (5th Cir.1991) (*citing United States v. Edelman*, 873 F.2d 791 (5th Cir.1989)), *cert. denied*, —— U.S. ——, 112 S.Ct. 967, 117 L.Ed.2d 133 (1992). We

note that *Riley* did not involve exclusion of defense evidence on this basis.

21. *Riley.*

22. *Compare United States v. Kelly*, 888 F.2d 732 (11th Cir.1989) (in prosecution of attorney for drug offenses involving client, error to exclude evidence—highly relevant to mental state—of defendant's understanding of his professional ethical obligations).

23. Hall also testified that EFS & L board minutes and mandatory disclosures to banking authorities did not reveal the interests of Brechtel and Gattuso in the Pepis and Yao transactions.

24. *Jimenez Lopez.*

25. 614 F.2d 486 (5th Cir.1980).

civil banking regulations which limited the amount of credit which the bank could extend to the defendant. Finding this evidence irrelevant to the issue of criminal liability, we held that in view of prosecution arguments and "the whole tenor of the trial," jury instructions permitting a conviction based upon the civil violation constituted plain error.[26] Later cases have understood *Christo* as being principally concerned with bootstrapping of civil violations into criminal liability, and have permitted use of civil violation evidence in criminal prosecutions for more limited purposes.[27] Further, we and our colleagues in other circuits have recognized the value of limiting instructions in attenuating any improper effect of such evidence when used for a permissible purpose.[28]

The case at bar differs substantially from *Christo*. Testimony regarding civil regulations constituted only a minor portion of Hall's testimony. To the extent that he mentioned disclosure requirements, they permissibly assisted the jury in understanding the significance of EFS & L's board minutes and management disclosures to thrift authorities. Hall's statement concerning the prohibition on interested director transactions properly

tended to demonstrate the defendants' motive for nondisclosure.[29] The government did not argue that any civil regulatory violation by Brechtel and Gattuso could alone give rise to criminal liability, and the district court admonished the jury that "[a] violation of banking regulations in and of itself does not amount to criminal conduct under federal law. The government must prove the elements of the offense beyond a reasonable doubt." We cannot conclude that Hall's testimony regarding civil regulations "impermissibly infect[ed] the very purpose for which the trial was being conducted."[30] The district court did not abuse its discretion in permitting Hall's testimony.

### 5. Sufficiency of the Evidence

Both Brechtel and Gattuso challenge the sufficiency of the evidence supporting their convictions.[31] In order to convict a defendant of improper participation in bank transactions under § 1006, the government must demonstrate: (1) the defendant's connection with a protected institution; (2) direct or indirect receipt of some benefit from a bank transaction; and (3) intent to defraud.[32] Brechtel and Gattuso claim only

---

**26.** *Id.* at 492.

**27.** *See United States v. Cordell*, 912 F.2d 769, 777 (5th Cir.1990) (evidence of civil regulation admissible to demonstrate bank's responsibility for allegedly misapplied funds); *United States v. McElroy*, 910 F.2d 1016, 1023–24 (2d Cir.1990) (evidence of regulations limiting lending for purchase of stock on margin admissible in criminal prosecution to explain basis for bank lending policies); *United States v. Smith*, 891 F.2d 703, 710 (9th Cir.1989) (evidence of civil regulation admissible to show motive for false statements), *cert. denied*, 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990); *United States v. Stefan*, 784 F.2d 1093, 1098 (11th Cir.) (evidence of civil regulation admissible to demonstrate motive for and assist jury in understanding series of "straw man" transactions), *cert. denied*, 479 U.S. 855, 107 S.Ct. 193, 93 L.Ed.2d 125, 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 706 (1986).

**28.** *Cordell; McElroy; Smith; Stefan.*

**29.** We note that Brechtel and Gattuso admitted their interest in the Saulet and Ames Farm parcels and hence in the Pepis and Yao transactions, resting their defenses solely on absence of criminal intent. Thus, Hall's testimony that Brechtel and Gattuso had interests in the Pepis and Yao transactions sufficient to trigger a duty of disclo-

sure under civil regulations did not prejudice the defendants.

**30.** *Christo*, 614 F.2d at 492.

**31.** Brechtel purports to challenge the district court's denial of his motions for judgment of acquittal under Fed.R.Crim.P. 29(a) as well as raise a sufficiency claim. By presenting defense evidence, Brechtel waived any objection to the district court's denial of his Rule 29(a) motion at the close of the government's case-in-chief. *E.g., United States v. Elam*, 678 F.2d 1234 (5th Cir. 1982). Thus, Brechtel's challenge to the denial of his latter Rule 29(a) motion simply restates the sufficiency claim.

**32.** *United States v. Griffin*, 579 F.2d 1104 (8th Cir.) (citing *United States v. Hykel*, 461 F.2d 721 (3d Cir.1972)), *cert. denied*, 439 U.S. 981, 99 S.Ct. 569, 58 L.Ed.2d 652 (1978). With respect to the "intent to defraud" element of section 1006, the defendants' jury was charged that:

To act with "intent to defraud" means to act knowingly with the specific intent to deceive or cheat for the purpose of causing some financial loss to another or to bring some financial gain to oneself. In this connection, the government does not need to prove that the United States,

that the government adduced insufficient evidence of their criminal intent.

■ We have long recognized the § 1006 insider participation provision as a typical conflict of interests prohibition.[33] Thus, a fiduciary who benefits or causes loss to the bank by knowingly subordinating the institution's interests to his own in a transaction for which he has responsibility acts with the "intent to defraud" required by § 1006.[34] As direct evidence of mental state is seldom available, the government may demonstrate that element of a § 1006 violation by circumstantial evidence.[35] An inference of intent to defraud arises where a responsible bank insider acts to procure a transaction which he knows will benefit him, without disclosing his interest therein.[36]

■ Well-settled law governs our sufficiency inquiry. We must view the evidence, giving due regard to the trier's credibility calls, and draw all reasonable inferences which favor the verdict.[37] If the evidence so viewed would permit a rational jury to find all elements of the crime beyond a reasonable doubt, we must affirm the conviction.[38] The evidence need not exclude all hypotheses of innocence.[39] Applying these standards, we find the evidence sufficient to support the convictions in this case.

#### a. Brechtel

■ Special Agent David Lyons of the F.B.I. testified that Brechtel acknowledged

an expectation that Yao would use proceeds of both EFS & L loans for purchase of the Ames Farm parcel. The jury properly could discredit Brechtel's denial on the witness stand that he ever had such an understanding. Marilyn Ortalano's testimony permitted a jury conclusion that Brechtel knowingly failed to disclose his interest in the initial Yao transaction and acted to procure its approval by the loan committee. Such evidence adequately supports Brechtel's conviction on count two.

■ With regard to count four, Roy Gattuso's April 29 letter and Brechtel's claim that he abstained from voting on the Yao workout loan reflect Brechtel's knowledge of his interest in that transaction on June 19, the date it obtained board approval. Discrediting Brechtel's contrary testimony, the jury reasonably could have inferred from the absence of contrary mention in the June 19, 1986 board minutes that Brechtel failed to disclose his interest in the latter Yao transaction and participated in its consideration. Brechtel's conviction on count four finds ample support in the record.

#### b. Gattuso

■ EFS & L minutes and Gattuso's own testimony indicate his presence at the meeting during which the board ratified the initial Pepis loan. Gattuso's insistence on the wit-

---

Enterprise Federal or anyone was actually defrauded. Similarly, the Government is not required to show whether or not Enterprise Federal suffered any loss as a result of the defendants' alleged actions. The term "to deceive or cheat" recognizes and includes the principle wherein one connected with a bank acts ostensibly solely for the interest of the bank while he, without complete disclosure, has a pecuniary interest which might subvert his undivided loyalty.

**33.** *United States v. Kehoe*, 573 F.2d 335 (5th Cir.), *vacated on other grounds*, 579 F.2d 971 (5th Cir.1978), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979); *Beaudine v. United States*, 368 F.2d 417, 420 (5th Cir.1966), *cert. denied*, 397 U.S. 987, 90 S.Ct. 1116, 25 L.Ed.2d 395 (1970).

**34.** *See Beaudine*, 368 F.2d at 420.

**35.** *Cf. United States v. Staller*, 616 F.2d 1284 (5th Cir.) (government may prove "guilty knowledge"

required for counterfeiting conviction by circumstantial evidence), *cert. denied*, 449 U.S. 869, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980).

**36.** *See United States v. Kimmel*, 777 F.2d 290 (5th Cir.1985) (approving jury instruction permitting inference that defendant intended natural and probable consequences of knowing act), *cert. denied*, 476 U.S. 1104, 106 S.Ct. 1947, 90 L.Ed.2d 357 (1986); *Hykel* (evidence that defendant failed to disclose and actively concealed interest in mortgage agreement supported finding of intent to defraud under § 1006).

**37.** *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

**38.** *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**39.** *E.g., Heath.*

ness stand that he informed Bob Evans of his interest in that transaction and that he and Brechtel left the January 17 meeting during its consideration permitted the jury to conclude that Gattuso knew at that time of his interest in the initial Pepis loan. Discrediting Gattuso's contrary assertion, the jury could infer from absence of any mention in the minutes regarding Gattuso's departure from the meeting, abstention from voting on the Pepis transaction, or disclosure of an interest in that transaction, that he did none of those things.[40] Sufficient evidence supports Gattuso's conviction on count one.[41]

■ Although a closer case than count one, we likewise believe that constitutionally sufficient evidence supports Gattuso's conviction on the second count of the indictment. The key issue here is whether there was sufficient evidence of Gattuso's intent to defraud EFS & L regarding the first of the two loans made by EFS & L to Yao on March 19, 1985. As discussed above, Yao paid over the proceeds from that loan to the partnership in which Gattuso and Brechtel possessed an interest.

At trial, the government's theory regarding Gattuso's guilt on the second count was that he attended the March 19, 1985 board meeting and even voted to approve the first Yao loan, while both knowing of his indirect pecuniary interest in the loan and without disclosing that interest to the board. We agree with the government that a section 1006 violation is clearly established when a member of a federally insured financial institution's board fails to disclose a direct or indirect pecuniary interest in a loan being approved by the board.[42] The only question regarding Gattuso's conviction on count two is whether there was sufficient evidence from which a rational jury could find beyond a reasonable doubt that Gattuse both knew about the first Yao loan before it was finalized and failed adequately to disclose his interest in the loan to responsible persons at EFS & L.

Because there is little question that no disclosure occurred by Gattuso or Brechtel regarding the partnership's interest in the first Yao loan, our chief inquiry is whether the evidence at trial, which was wholly circumstantial, would permit a rational jury to find beyond a reasonable doubt that Gattuso knew that EFS & L was making a loan to Yao. At the outset, we observe that three larger circumstances militate in favor of such a finding: first, a jury could rationally conclude that a sophisticated real estate broker such as Gattuso—who had been in the real estate business for over three decades—would not likely have been in the dark about important business transactions directly affecting a partnership in which he had a significant interest. This is particularly true in view of the substantial evidence that Gattuso himself, on behalf of the partnership, signed the documents closing the sale of the Ames property to Yao contemporaneously with the finalization of the first loan to Yao.[43]

**40.** Teresa Lomonaco, EFS & L's executive secretary, testified that board members from time to time left meetings, and that she would only record those absences in the minutes if requested to do so. Gattuso urges that this testimony precludes any inference from silence in the minutes regarding his participation in board consideration of the initial Pepis loan. We disagree. The jury was free to discredit Lomonaco's testimony and, in any event, her statements at worst weaken the inference regarding Gattuso's participation in the board meeting to which silence in the minutes gives rise. Notably, minutes from other meetings reflect non-participation by directors in consideration of loans due to conflict of interest. This argument fails to persuade.

**41.** Gattuso insists that his signature on documents relating to the Saulet sale adequately disclosed his interest in the Pepis transaction, and negated any hypothesis of criminal intent. We are not persuaded. The record indicates that, when the full board of directors considered loans for ratification, it did not ordinarily have access to documentation underlying them. Absent disclosure by Gattuso, the board could have no knowledge of his interest in the Saulet transaction. Thus, Gattuso's knowing failure to disclose his interest at the board meeting amply supports a finding of criminal intent.

**42.** We see no need in the instant case to define the degree of *indirect* benefit required to make out a section 1006 violation since unquestionably the indirect benefit inuring to Gattuso from Yao's payment of the loan proceeds to the partnership was clearly substantial enough.

**43.** The closing of the sale, which was financed by the EFS & L loan, occurred on April 1, 1985. There is substantial evidence in the record that EFS & L's executive committee—of which Bre-

Second, we observe that there was substantial evidence that Gattuso's co-defendant and business partner, Brechtel, and Gattuso's cousin and attorney for the partnership, Roy Gattuso, were both well aware that Yao was in the process of obtaining financing from EFS & L for the purpose of purchasing the Ames Farm property in early 1985.[44] Although the fact that one's close business associates were privy to information highly relevant to a joint business concern does not by itself support a finding that the information was passed on to the other partner, certainly it is probative and, when combined with other evidence, would permit an inference that communication occurred.[45]

Third, we observe that the timing of Yao's exercise of the option on the Ames property and Yao's obtaining the loan, which occurred in early 1985, were roughly contemporaneous with Gattuso's involvement in the Pepis loan scheme.[46] Although the two real estate transactions were distinct, the government presented substantial evidence that Nikitas Pepis and Lynn Yao were each affiliated with Stavros Amitsis.[47] A jury could rationally infer that Pepis and Yao acted in conjunction. That is, in view of the overlapping timing between the Pepis and Yao transactions and corresponding loans and the debtors' common link to Amitsis, a rational jury could believe that the Yao loan and the Pepis loan were part of a common plan or scheme to defraud EFS & L. *Cf.* Fed.R.Evid. 404(b). Accordingly, a rational jury could infer that Gattuso's guilty knowledge regarding the Pepis loan extended to the Yao loan.

Yet such larger circumstantial factors, by themselves, would not permit a rational jury to find Gattuso's guilt beyond a reasonable doubt. Thus, an examination of the government's other evidence is in order. Of particular importance is Government Exhibit 20, a two-page document entitled "Executive Committee Meeting of March 7, 1985, Loans for Ratification," which lists a dozen or so loans to be later ratified by the board of directors. Among them is a $500,000 line of credit to Lynn Yao. Although a notation on the document states, "SECURED BY VARIOUS PROPERTIES"—and thus makes no specific mention of the Ames Property—the closing of the sale of the Ames Property occurred less than two weeks later, on April 1, 1985. We believe that, assuming Gattuso saw this document, a rational jury could believe that Gattuso knew that the notation about Yao must have concerned a loan for the sale of the Ames Property.

At issue, however, is whether that document was seen by Gattuso at the March 19, 1985 board meeting. Admittedly, the two pages of typed minutes from the meeting make no reference to the ratification of the executive committee's loans (including Yao's) on March 7, 1985. Moreover, Gattuso denied knowing that Yao was seeking financing for the purchase of the Ames Property until *after* the loan was finalized. Two pieces of evidence belie his claim. First, it is clear that Gattuso attended the board meetings in early 1985, including the March 1985 meeting, and there is no indication that he made disclosure of his interest in the Yao loan or

chtel, but not Gattuso, was a member—approved the first loan on March 7, 1985. As discussed *infra*, there was also evidence offered at trial that the bank's board approved of the loan later that month, on March 19. Finally, as discussed *infra*, at trial the government conclusively proved that the first Yao loan—which was in the form of a line of credit—was formally opened on April 1, 1985, the same date as the closing of the sale of the Ames property. On that same day, Yao also executed a promissory note and collateral mortgage note.

44. In early 1985, Yao exercised an option contract to purchase the Ames Farm property from the partnership.

45. That inference would be strengthened by the fact that Roy Gattuso was Phillip Gattuso's cousin, although mere consanguinity is not sufficient by itself to conclude that one relative necessarily informed the other relative of pertinent information. *Cf. United States v. Thompson,* No. 92–1037, unpub. op., p. 9, n. 14 (5th Cir. March 24, 1993) [990 F.2d 625 (Table)] ("In the instant case, the government asks that we infer from the loan of the car and allowing his brother access to his house that Kenneth Thompson knew that his brother planned to rob a bank. We decline the invitation.").

46. We previously held that there was sufficient evidence to support Gattuso's conviction under section 1006 for that count of the indictment.

47. Gattuso testified that he knew Yao was affiliated with Amitsis.

even abstained from voting in any ratification of committee-approved loans. Second, on the top of page two of the document entitled "Loans for Ratification"—which included the Yao loan—appears the date "March 19, 1985." This is evidence, albeit not conclusive evidence, from which a rational jury could infer that the board of directors did indeed ratify the executive committee loans (including Yao's) at the March 19, 1985 board meeting. Furthermore, in Gattuso's own trial testimony, he stated that he believed that in the spring of 1985 the board of directors was required to ratify all committee-approved loans.

We additionally observe that the $500,000 loan to Yao in the spring of 1985 was in the form of a line of credit. The promissory note and collateral mortgage note executed by Yao in favor of EFS & L were signed on April 1, 1985. According to the express terms of the collateral mortgage note, "Lender has this date agreed to make a loan ... to Borrower up to the amount of Five Hundred Thousand and No/100 ($500,000) DOLLARS...." Thus, Yao's actual line of credit was formally opened on April 1, 1985. Notably, the date that the Ames Property sale closed was also April 1, 1985. It is undisputed that Phillip Gattuso attended the closing; indeed, his signature appears on the documentation memorializing the closing. Because Gattuso signed documentation at the closing, a jury could rationally infer that he knew that the sale of the property was being financed by EFS & L.[48] Thus, even if Gattu-

so did not vote to ratify the line of credit at the March 19, 1985 board meeting and only discovered the loan afterwards, a rational jury could infer that Gattuso would have discovered that Enterprise was financing the loan on April 1, 1985. Thus, even as late as that date, Gattuso still could have informed the bank of his conflict and prevented the consummation of the transaction involving EFS & L funds.[49]

In sum, although admittedly a close case, we conclude that a rational jury could find beyond a reasonable doubt, in view of the totality of circumstantial evidence, that Gattuso, with the intent to defraud, knowingly "share[d] in or receive[d] directly or indirectly ... money ... through" EFS & L. 18 U.S.C. § 1006.

■ With respect to count four, we also believe that a rational jury could find beyond a reasonable doubt that Gattuso intended to defraud EFS & L in violation of 18 U.S.C. § 1006. Admittedly, there is no evidence that Gattuso was present at the June 19, 1986 board meeting where Yao's second loan was approved.[50] There is, however, direct evidence that would permit a rational jury to conclude beyond a reasonable doubt that Phillip Gattuso did know, as early as April of 1986, that Yao was seeking supplemental financing from EFS & L in order to stave off the partnership from foreclosing on the Ames Property.[51] In particular, the government offered a copy of a letter written by Roy Gattuso to his cousin Phillip in April

48. It is common knowledge that participants at a real estate closing—in particular, the seller—typically would not be ignorant of the buyer's source of financing. A rational jury could thus disbelieve Gattuso's claim that he was unaware of the source of Yao's financing when Gattuso attended the April 1 closing.

49. Among the government's evidence at trial was an EFS & L cashier's check made out to Vezina and Associates—Roy Gattuso's law firm—in the amount of $96,000.00. The check, which was dated April 1, 1985, was part of the down payment for the sale of the Ames Property. In turn, the Vezina law firm made out separate checks to Brechtel (and his wife) and Estate of Sam Gattuso (of which Phillip Gattuso was the executor) in the amount of $5,955.60 and $8,933.40, respectively. The back of the check to Vezina and Associates bears Neil Vezina's stamped endorse-

ment and is dated April 2, 1985. The back of the check to Gattuso is endorsed "Estate of Sam Gattuso" and is dated April 12, 1985.

50. As we discussed *supra*, the government's evidence offered at trial would permit a rational jury to find beyond a reasonable doubt that Brechtel was present at the board meeting where the second Yao loan was approved and voted for it without disclosing his interest. Although Brechtel testified that he did indeed disclose his and Gattuso's interest in the second Yao loan at the June 19 board meeting, other evidence contradicts his bare assertion.

51. When the Ames Property was sold on April 1, 1985, the partnership assumed a first mortgage on the property and EFS & L assumed a second mortgage on the property, which was inferior to the first mortgage.

1986 explicitly stating that Yao would be attempting to work out additional financing from EFS & L in order to preclude a foreclosure by the partnership. The government adequately established that Phillip Gattuso did not disclose his interest in the second Yao loan following receipt of that letter.[52] The government also offered undisputed evidence that Phillip Gattuso received a check that was directly traceable to the ultimate loan proceeds from the second Yao loan. Thus, the loan proceeds from the second Yao loan did not merely benefit the partnership in which Phillip Gattuso possessed an interest, but benefitted Gattuso directly.

■ We hold that the government need not offer evidence that a board member such as Gattuso actually voted or otherwise engaged in affirmative conduct, in his capacity as a responsible bank official, to secure a loan in which he possessed a pecuniary interest. Rather, mere knowledge that such a loan is being obtained coupled with a failure to disclose his interest establishes a violation of 18 U.S.C. § 1006. A board member of a financial institution such as Gattuso is a classic fiduciary who owes the institution an affirmative duty to disclose all potentially substantial conflicts of interest. He cannot escape that duty simply by not attending the board meeting at which a transaction implicating those conflicts is approved while thereafter pocketing the proceeds.[53]

### 6. New Trial Motion

In his final assignment of error, Brechtel essentially reiterates his previous points, asserting that at minimum they required the district court to grant his motion for new trial. The trial court's superior vantage point on the weight and effect of evidence provides the basis for our review of its new trial rulings only for abuse of discretion.[54] As Brechtel's other assignments of error lack merit, we cannot conclude that the district court abused its discretion in denying his motion for new trial. This claim also lacks merit.

### Conclusion

For the foregoing reasons, the convictions are AFFIRMED.

POLITZ, Chief Judge, Concurring in Part and Dissenting in Part:

I agree with most of the majority opinion. There is sufficient evidence to support Brechtel's convictions on counts two and four and Gattuso's conviction on count one. I concur in the affirmance of the convictions on these counts. I find the evidence in support of Gattuso's convictions on counts two and four to be woefully inadequate. I must dissent from the majority's holding to the contrary.

It is not the function of an appellate court to fill in the gaps and voids in the evidence and to rule on the basis of evidence which could have or might have been offered. We are to review solely on the basis of what in fact was offered in evidence at trial.

In order to sustain a conviction the evidence need not eliminate all hypotheses of innocence. Our precedents, however, make equally clear that mere consistency with a theory of guilt will not suffice. Rather, where the evidence viewed most favorably to the government provides equal or near equal support to inferences of guilt and innocence,

---

**52.** There is a document in the record that shows that apparently some official or officials in EFS & L knew that a portion of Yao's second loan was going to Gattuso. However, that document is dated August 12, 1986—well after the board approved the second loan.

**53.** Although the jury instructions in the instant case and some section 1006 cases speak of an "act with the intent to defraud" by a defendant, see, e.g., Beaudine, 368 F.2d at 420, we do not believe that a defendant must literally engage in a specific action aimed at defrauding a federally-insured institution in order to violate section 1006. Rather, we believe that by intentionally failing to disclose a known conflict of interest, a fiduciary such as a board member "acts" to defraud by continuing on in his fiduciary capacity and, at the same time, failing to apprise responsible officials in his institution of the conflict.

**54.** E.g., United States v. Baytank (Houston), Inc., 934 F.2d 599 (5th Cir.1991); United States v. Arroyo, 805 F.2d 589, 599 (5th Cir.1986).

a rational jury necessarily must entertain a reasonable doubt.[1]

The majority initially reasons that, in view of Government Exhibit 20 and Gattuso's testimony regarding EFS & L loan approval practices, a rational jury could conclude that the full EFS & L board considered and approved the Yao transaction at its March 19, 1985 meeting. Government Exhibit 20 consists of two pages detailing approval of loans by the bank executive committee. Its first page indicates that the executive committee considered those transactions on March 7, 1985. At the top of its second page, which contains the reference to the initial Yao transaction, Government Exhibit 20 bears the notation "March 19, 1985, Cont." Further, during cross-examination, Gattuso testified to his belief that, in early 1985, loans generally required approval from both the full board and the executive committee.[2] Certainly, if the EFS & L board approved the initial Yao transaction at that time— concededly in Gattuso's presence—a jury could infer the mental state required by § 1006. I cannot, however, agree that the evidence relied upon so heavily by the majority would permit a rational jury to reach that conclusion beyond a reasonable doubt.

The record is silent about the discrepancy in dates between the first and second pages of Exhibit 20 or the significance of the "March 19, Cont." notation. At best, that exhibit permits an inference as to the date on which the executive committee approved the initial Yao transaction. It does not purport to indicate when or if the full board acted on the transactions detailed. Although Gattuso testified that transactions generally required approval by the full board as well as the executive committee, the government produced no evidence tying the initial Yao loan

to any particular meeting. Documentary evidence suggests that the EFS & L board *never* considered this transaction: although copies of minutes filed in evidence reflect approval of executive committee actions on many occasions, the record is devoid of *any* evidence indicating approval of actions taken by the executive committee on March 7 or March 19. In any event, Gattuso's testimony, corroborated by board minutes, indicates that with near uniformity, the board gave its assent to loans about two weeks after executive committee action.[3] Considering the record as a whole, Gattuso's bare and equivocal statement that the board "generally" approved loan transactions after executive committee action, even supplemented by Exhibit 20, simply does not amount to proof beyond a reasonable doubt that the board considered the Yao transaction on March 19, 1985 in Gattuso's presence.

Alternatively, the majority suggests that even if Gattuso did not vote to approve the initial Yao loan on March 19, the jury could have inferred his knowledge that EFS & L financed the Ames Farm purchase from his presence at the April 1 closing. The majority opines that if Gattuso learned of EFS & L's interest in the loan on April 1, his failure to stop the transaction and inform the bank of his interest gives rise to an inference of intent to defraud under § 1006. I simply cannot accept this proposition.

Lynn Yao produced a cashier's check—not a bank check—at closing. Further, Roy Gattuso—not Phillip Gattuso—managed the Ames Farm partnership. The government produced no evidence that Roy Gattuso ever informed Phillip Gattuso regarding Yao's financing, or even that he generally provided such information to his cousin regarding real

---

1. *Clark v. Procunier,* 755 F.2d 394 (5th Cir.1985).

2. I note that Gattuso expressed reservation about that statement. The record reflects the following exchange:
   Q. The board of directors had not stopped ratifying the actions of the executive committee at this time, had it?
   A. To my knowledge, no, I guess. *I don't have that information in front of me to know that.*

Q. The loans which the executive committee approves, that still would go over to the board for approval; isn't that right?
A. I would think so.
Trial Transcript, at 491 (emphasis added).

3. Such a delay would place approval of the initial Yao loan at the April 1985 board meeting. The minutes of that meeting reflect that Gattuso was not in attendance.

estate sales.[4]  Further, Phillip Gattuso had an extremely attenuated interest in the Yao transaction: his father's estate owned ten percent of the parcel sold.  In view of these facts, I do not believe that a jury could infer, from Gattuso's mere presence at the Ames Farm closing, that he knew EFS & L had provided funds to Lynn Yao for the purchase.  Even if I agreed with the majority's proposition, I could not agree that Gattuso's knowledge at the closing would support criminal liability under § 1006.  It is not contested that when Yao arrived at the Ames Farm closing EFS & L had completed the transaction, at least to the extent of $96,000, without a suggestion of the exercise of influence or even passive approval by Gattuso.  The insider participation provisions of § 1006 seek to protect financial institutions from influence by fiduciaries with divided loyalties.[5]  Acceptance by an insider of benefit from a bank transaction where the insider learns of the transaction only *after* its completion cannot give rise to that concern.  I would hold that a jury could not infer the intent to defraud required by § 1006 merely from such facts.

As to Count 4, the majority reasons that receipt of Roy Gattuso's April 29, 1986 letter placed Phillip Gattuso on notice of his interest in the latter Yao transaction.  It then holds that, given such knowledge, the jury could infer intent to defraud from Gattuso's failure to make disclosure, notwithstanding his absence from the meeting at which the board approved that loan and the absence of any evidence indicating his active pursuit of its approval.  The April 29 letter, in relevant part, stated "Mr. Yao is seeking financial arrangements with Enterprise Federal for payment of the above captioned debt.  If Enterprise fails to extend credit to Mr. Yao, I will commence foreclosure proceedings immediately."  Receipt of this letter does not establish Gattuso's knowledge that Yao actually followed through on his expressed intention, or that his application met with sufficient lower-echelon approval at EFS & L to bring a proposed transaction before the board for approval.  I am persuaded that a rational jury could not find, beyond a reasonable doubt, on the basis of the April 29 letter alone, that Gattuso knew the EFS & L board was considering the Yao workout loan.  The jury perforce could not find, therefore, that Gattuso's failure to disclose gave rise to an inference of criminal intent.[6]

For these reasons, I concur in part and dissent in part.

---

4. *See United States v. Thompson*, No. 92–1037, slip op. at 9 n. 14 (5th Cir. March 24, 1993) [990 F.2d 625 (Table)] (mere fact that defendant lent car to his brother did not permit inference that he knew of criminal purpose for which car would be used).

5. *See United States v. Munna*, 871 F.2d 515 (5th Cir.1989); *Beaudine v. United States*, 368 F.2d 417 (5th Cir.1966).

6. I would not today determine whether failure by a responsible insider to disclose a known interest in a transaction under consideration could give rise to an inference of intent to defraud in the absence of affirmative acts to procure it.