<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 98-1684

                         UNITED STATES,

                           Appellee,

                               v.

                     RAMIRO L. COLON-MUNOZ,

                     Defendant, Appellant.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

       [Hon. Carmen Consuelo Cerezo, U.S. District Judge]

                             Before

                      Lynch, Circuit Judge,
               Bownes, Senior Circuit Judge, and
                          Lipez, Circuit Judge.

    Jorge E. Vega-Pacheco, Assistant United States Attorney, with
whom Guillermo Gil, United States Attorney and Nelson Prez-Sosa,
Assistant United States Attorney, were on brief for appellee.
    Peter Goldberger, with whom Jan Armon, Ellen C. Brotman, and
Pamela A. Wilk were on brief for appellant Coln.
    G. Richard Strafer and Barbara Bergman on brief for National
Association of Criminal Defense Lawyers, amicus curiae.

October 1, 1999

                                
 LIPEZ, Circuit Judge.  We consider in this appeal
criminal convictions relating to a real estate transaction in
Puerto Rico in the 1980s.  The defendant, Ramiro L. Coln-Muoz,  
formerly President of Ponce Federal Bank, was convicted of
misapplication of bank funds (five counts), bank fraud, making a
false entry on a loan document, making a false statement on a loan
application, fraudulently benefitting from a bank loan, and
conspiracy.  The real estate at issue, a farm called La Esmeralda
("the farm" or "La Esmeralda") was also forfeited.   Coln now
raises a variety of objections to the convictions and forfeiture,
beginning with the claim that his indictment was invalid because of
interim United States Attorney Guillermo Gil's participation before
the grand jury pursuant to an unconstitutional judicial
appointment.  Coln also challenges the sufficiency of the evidence
to support his convictions and claims that the forfeiture of La
Esmeralda violated the Ex Post Facto Clause of the United States
Constitution.   
 Although we conclude that Coln waived his challenge to
the validity of the indictment, we agree that there was
insufficient evidence to support his convictions on four of the
five misapplication counts and the false statement count, and that
the forfeiture of the real estate violates the Ex Post Facto Clause
of the Constitution.   We affirm the convictions on one count of
misapplication, and on the counts of bank fraud, false entry,
fraudulently benefitting from a bank loan, and conspiracy.
I. Background    
 We have already considered many of the issues at hand in
the appeal of Coln's co-defendant, Jos Blasini-Lluberas.  As the
scheme at issue was set forth in great detail in our opinion in
that case, United States v. Blasini-Lluberas, 169 F.3d 57, 60-62
(1st Cir. 1999), we offer here a limited statement of the facts
which the jury could have found from its review of the evidence,
supplemented by the specifics of Coln's involvement where
necessary.
 On July 15, 1987, Coln and his wife purchased La
Esmeralda from thirteen members of the Usera family who had
inherited the farm.  Coln paid $83,340 at the closing and the
balance of $472,260 was due nine months later on April 14, 1988.  
As security for the balance of the purchase price, Coln granted
the Usera family a mortgage on the property.
 Following Coln's purchase of the farm, but prior to the
due date of Coln's outstanding $472,260 obligation, four members
of the Usera family approached Coln requesting money. Each family
member had a specific reason for requesting a loan but, generally
speaking, the family members were seeking funds to satisfy
obligations unrelated to the sale of the farm.   Coln agreed to
help them, sending the family members to see Blasini, then an
executive vice-president of Ponce Federal Bank ("the bank"), and
instructing him to assist each of them in securing a loan from the
bank.  As vice-president of the bank, Blasini was authorized to
approve unsecured loans up to $50,000 and secured loans up to
$100,000.  Blasini authorized the loans, ranging from $11,000 to
$20,000, subject to a standard rate of interest and a due date.  
None of the loan applications included a financial statement or
credit history.  Each family member, however, executed partial
assignments of their mortgage interests in the farm as security for
the loans.  Although the partial assignments were signed by both
Blasini and Coln, they were not included in the loan file. The
stated purpose for the loans was personal; the means of repayment
was the sale of a farm. Because the loans did not exceed $50,000,
their approval did not require collateral as a matter of bank
policy.
 When Coln's debt to the Usera family came due on April
14, 1988, he was unable to satisfy his obligation. On April 19,
1988, another member of the Usera family, Consuelo Garca-Gomez,
went to the bank and demanded payment of her share of the purchase
price. Consuelo Garca-Gomez was entitled to $200,000, the largest
share of the inheritance.  Wendell Coln, Coln's brother, told
Consuelo Garca-Gomez that the money was not immediately available.  
She then asked for $100,000. Thereafter, Blasini brought Consuelo
Garca-Gomez to a loan officer and instructed the officer to
disburse a $100,000 loan to her. The information in her loan
application was provided to the loan officer by Blasini and the
application stated that collateral for the loan was a partial
assignment of Consuelo Garca-Gomez's mortgage interest in the
farm. The listed purpose of the loan was the purchase of an
apartment. On the loan application, directly above Blasini's
signature, Blasini wrote, "discussed and agreed to by attorney
R.L. Coln."  At trial Consuelo Garca-Gomez explained that,
although she signed loan documents to receive the $100,000, she did
not go to the bank for the purpose of obtaining a loan and she
never read the loan documents before signing them.  She maintained
that the $100,000 was partial payment of the money owed to her
rather than a loan.  
 On May 13, 1988, Coln paid the balance of the purchase
price of the farm to the Useras.  Coln wrote two sets of checks
from his personal account.  The first set paid off the bank loans
of Monserrate Usera, Ana Usera, Carmen Maduro, Vicente Usera and
Consuelo Garca-Gomez. He listed the appropriate amount of their
outstanding debts, including the interest that had accrued, and
named both the bank and the borrower as joint payees. The second
set of checks paid each family member the balance of what he or she
was owed.  They then signed a cancellation of the mortgage.
 When members of the Usera family presented the checks at
the bank for immediate payment, Coln's personal account had
insufficient funds to pay all of the checks.  Blasini authorized  
a bank officer to substitute official bank checks for Coln's
personal checks.  The official bank checks were debited against
Coln's personal checking account.  At the close of business on May
13th, Coln's personal account was overdrawn by $122,930.   
 The following business day, May 16, Coln deposited
$492,394 in his personal account from the proceeds of a $500,000
loan he obtained from the Royal Bank of Puerto Rico ("Royal Bank").  
A month before, in April, Coln had applied for the loan, initially
contacting the Vice President of Royal Bank by phone to discuss the
possibility of such a loan.   Notwithstanding the fact that in
April the Useras still had a mortgage on the farm, Coln and his
wife prepared a mortgage deed which stated that Royal Bank was
granted a first mortgage on La Esmeralda. The mortgage deed was
filed at the registry of deeds on April 19, 1988.  However, in the
financial documents submitted to Royal Bank, the Usera family's
pre-existing first mortgage on the property was fully disclosed.   
The loan was approved on May 4th but was not actually disbursed
until May 16th, three days after the Useras released their mortgage
on the farm.
 Two years later, in August of 1990, Coln received a
severance package from Ponce Federal Bank in the amount of
$615,500.  With those monies, he paid off the balance of his loan
from Royal Bank.
 In 1995, Coln was indicted on multiple counts relating
to these transactions.  Following a trial, Coln was convicted on
five counts of misapplication of bank funds under 18 U.S.C.  657,
one count of bank fraud under 18 U.S.C.  1344, one count of false
entry under 18 U.S.C.  1006, one count of benefitting, directly or
indirectly, from the loan transactions in question under 18 U.S.C.
1006, one count of false statement under 18 U.S.C.  1014, and
one count of conspiracy under 18 U.S.C.  371.  The jury also
returned a verdict of forfeiture as to Coln's interest in La
Esmeralda under 18 U.S.C.  982(a)(2).
 Coln filed a post-trial motion for a judgment of
acquittal under Fed. R. Crim. P. 29(c), challenging the sufficiency
of the evidence and, for the first time, the validity of the
indictment because of interim United States Attorney Guillermo
Gil's participation before the grand jury.  He argued that Gil's
judicial appointment was unconstitutional and sought discovery on
the circumstances of the appointment.  The motion for discovery and
the motion for a judgment of acquittal were denied.
 Coln was sentenced to twenty-one months imprisonment
followed by two years of supervised release.  He was also fined
$20,000 and his interest in La Esmeralda was forfeited.   
II. The Appointment of the Interim United States Attorney
 As noted, Coln raised for the first time in his motion
for a judgment of acquittal a claim that Guillermo Gil's judicial
appointment as the interim United States Attorney for the District
of Puerto Rico was constitutionally invalid.  Specifically, he
maintained that 28 U.S.C.  546(d), which allows the district court
to appoint an interim United States Attorney, violates both the
Appointments Clause of the United States Constitution, art. II,
2, cl. 2, and the principles of separation of powers.  On the
basis of this alleged constitutional violation, Coln argued that
Gil's participation in the grand jury proceedings that led to
Coln's indictment violated Fed. R. Crim. P. 6(d), which provides
that only attorneys for the government may be present while the
grand jury is in session. Because Gil was improperly appointed,
Coln argued that Gil was not an attorney for the government who
was authorized to be present before the grand jury.  On appeal,
Coln reasserts this argument and seeks the dismissal of the
indictment.
 We do not reach the merits of Coln's claim.  The rules
unmistakably require that "objections based on defects in the
institution of the prosecution" or "defects in the
indictment . . . must be raised prior to trial."  Fed. R. Crim. P.
12(b).  Coln first raised his constitutional objection to Gil's
participation before the grand jury in his post-trial motion for a
judgment of acquittal.  Although the rules permit a defendant to
show "cause" for his failure to raise his objections pre-trial, see
Fed. R. Crim. P. 12(f) ("the court for cause shown may grant relief
from the waiver"), Coln's showing is unpersuasive.  
 Coln protests that he only learned of Gil's involvement
in the grand jury proceedings through the Jencks Act materials he
received during the trial.  Nonetheless, he failed to file any
objections at the time he received the Jencks material, waiting
instead for a jury verdict and the filing of his motion for a
judgment of acquittal.   Moreover, Coln was well aware of Gil's  
personal involvement in this case pre-trial.  Defense counsel met
personally with Gil on one occasion and phone calls and letters
were exchanged relating to trial preparation and discovery issues.
Gil's name appeared on the indictment.  Despite these facts, Coln
did not seek any pre-trial discovery to investigate the nature of
Gil's participation in the grand jury proceedings pursuant to the
procedures set forth in Fed. R. Crim. P. 6(e)(3)(C)(i),(ii).  
Under these circumstances, we conclude that Coln has not
demonstrated cause for his failure to raise his objection pre-trial
and we will not grant relief from his waiver.  
 In an effort to escape the consequences of waiver, Coln
argues that his challenge to the appointment of the interim United
States Attorney on the basis of the Appointments Clause of the
United States Constitution and separation of powers principles is
jurisdictional and cannot be waived. See Fed. R. Crim. P. 12(b)(2)
(objections "that [the indictment] fails to show jurisdiction in
the court . . . shall be noticed by the court at any time during
the pendency of the proceedings").   We disagree with Coln's
characterization of his claim.
 In Freytag v. Commissioner of Internal Revenue, 501 U.S.
868, 878 (1991), the Supreme Court recognized that a challenge
under the Appointments Clause to the propriety of a statute which
permitted the judicial appointment of special trial judges in the
Tax Court raised both "structural" and "political" concerns.
Notwithstanding the structural and political implications of the
underlying claim, the Court characterized it as nonjurisdictional.  
See id. at 878-79; see also Glidden Co. v. Zdanok, 370 U.S. 530,
535-36 (1962)(including Appointments Clause objections to judicial
officers in the category of nonjurisdictional structural
constitutional objections).  Although the challenge in Freytag
concerned the judicial appointment of other judges, and the
challenge in this case concerns the judicial appointment of an
interim United States Attorney, we see no basis for characterizing
this claim differently.  The Freytag Court accepted the proposition
that "[t]he alleged defect in the appointment . . . goes to the
validity of the [court] proceeding." Id. at 879.  Coln made a
similar claim here.  His challenge to the constitutionality of
Gil's appointment as interim United States Attorney was a
nonjurisdictional claim and it was waived. Cf. United States v.
Gantt, 179 F.3d 782, 786-87 (9th Cir. 1999) ("An infirmity in the
United States Attorney's appointment would not generally affect the
jurisdiction of this court so long as a proper representative of
the government participated in the action. . . . [T]he
constitutionality of  546(d) would not affect the validity of
indictments . . . as indictments need only be signed by an attorney
for the government.").   
 We have used the term "waiver" in evaluating the
timeliness of Coln's challenge to Gil's participation before the
grand jury because Rule 12(f) uses that term.  Pointing to the use
of that term in Rule 12, the government, relying on United States
v. Olano, 507 U.S. 725, 733 (1993) notes that "waiver" is different
from "forfeiture."  Since waiver extinguishes plain error review,
the government argues, and since Rule 12(f) refers to waiver, the
government contends that the rule itself precludes plain error
review here.  
 We need not resolve this issue given the Supreme Court's
decision in United States v. Mechanik, 475 U.S. 66 (1986),
concluding that alleged violations of Rule 6(d), not raised pre-
trial, are rendered harmless as a matter of law by a subsequent
guilty verdict at trial.   Coln's constitutional objections to
Gil's appointment are the predicate for his claim that Gil's
presence before the grand jury violated Rule 6(d).  As a remedy
for this error, Coln asks for dismissal of the indictment.  
Mechanik precludes any such relief.
 In Mechanik, two government witnesses testified in tandem
before the grand jury, which ultimately indicted both defendants on
various drug related offenses. See id. at 67.  At trial, once the
defendants learned of the alleged violation, the defendants
objected to the joint presence of the two witnesses and moved for
a dismissal of the indictment on the basis that the "simultaneous
presence of the two agents had violated Federal Rule of Criminal
Procedure 6(d)."  Id. at 68.  The district court took the motion
under advisement.  Following a guilty verdict, the district court
denied the motion on the basis that, notwithstanding any violation
of Rule 6(d), there had been no harm to the defendants given the
subsequent guilty verdict.  The Supreme Court agreed with the
district court's reasoning, concluding that "however diligent the
defendants may have been in seeking to discover the basis for the
claimed violation of Rule 6(d), the petit jury's verdict render[s]
harmless any conceivable error in the charging decision that might
have flowed from the violation." Id. at 73.  The Supreme Court
explained its reasoning:
   The rule protects against the danger that a
 defendant will be required to defend against a
 charge for which there is no probable cause to
 believe him guilty.  The error involving rule
 6(d) in these cases had the theoretical
 potential to affect the grand jury's
 determination whether to indict these
 particular defendants for the offenses with
 which they are charged. But the petit jury's
 subsequent guilty verdict means not only that
 there was probable cause to believe that the
 defendants were guilty as charged, but also
 that they are in fact guilty as charged beyond
 a reasonable doubt.  Measured by the petit
 jury's verdict, then, any error in the grand
 jury proceeding connected with the charging
 decision was harmless beyond a reasonable
 doubt.
Id. at 70 (citation omitted).
 Mechanik's reasoning applies to this case.  As a matter
of law, any error in the charging decision of the grand jury was
rendered harmless by the verdict and Coln cannot claim that Gil's
presence before the grand jury entitles him to a dismissal of the
indictment.  We caution, however, that this conclusion implies no
judgment about the importance of the issues raised by Coln or the
Association in their challenge to the constitutionality of the
lengthy interim judicial appointment of the United States Attorney.  
Aided by the long and thoughtful brief of the Association, they
claim, as already noted, that 28 U.S.C.  546(d) is
unconstitutional on Appointments Clause and separation of powers
grounds, and claim further that  546(d) is unconstitutional as
applied because the district court's interim appointment of Gil has
become de facto permanent.  These are serious issues.  Timely
raised, they would merit careful attention.   
III. Sufficiency of the Evidence
 We turn to a discussion of the challenges to the
sufficiency of the evidence.  In evaluating such claims, we review
the evidence as a whole, together with all reasonable inferences
therefrom, in a light most favorable to the government. See United
States v. Mangual-Corchado, 139 F.3d 34, 44 (1st Cir. 1998).  
Viewing the evidence in this light, "[w]e review de novo the
district court's determination that the jury reasonably found 'each
element of the crime to have been proven beyond a reasonable
doubt.'"  Id. (quoting United States v. Houlihan, 92 F.3d 1271,
1295 (1st Cir. 1996)).  Where "an equal or nearly equal theory of
guilt and a theory of innocence is supported by the evidence" we
must reverse a conviction. Blasini, 169 F.3d at 62 (alteration
omitted).
A. Misapplication of bank funds (Counts Two through Six)
 We conclude, as we did in Blasini, see id., that there
was insufficient evidence from which a reasonable jury could
conclude that the loans to Ana Usera, Monserrate Usera, Carmen
Maduro Usera and Vicente Usera Tous constituted a criminal
misapplication of bank funds.  See id. at 62-64. Given our
conclusion in Blasini that there was sufficient evidence to convict
Blasini on the count of misapplication relating to Consuelo Garca-
Gomez, we must consider whether there was also sufficient evidence
to convict Coln of that offense.
 As discussed in detail in Blasini, when Consuelo Garca-
Gomez went to Ponce Bank in April 1988 and demanded payment,
Coln's $200,000 debt to her was past due.  She did not request a
loan.  At the bank she initially met with Coln's brother who
informed her that the money was unavailable.  She suggested payment
of $100,000.  Thereafter, Blasini took Consuelo Garca-Gomez to
meet with Marisel Marrero, the assistant bank manager, and
instructed her on the details of the loan application.  See id.  A
$100,000 loan was then disbursed to Consuelo Garca-Gomez that day.  
The notation on the loan application admitted in evidence read
"discussed and agreed to by attorney R.L. Coln."
 Although the loans to the four other Usera family members
were not misapplication of bank funds, Coln was "playing it close
to the line" in his dealings with them. Id., 169 F.3d at 64.  When
Consuelo Garca-Gomez arrived at the bank demanding payment of the
already-matured debt, the jury could have reasonably concluded that
Coln crossed the line by deceptively using Ponce Bank funds to
satisfy his private debt under the guise of a bank loan to a woman
who did not want a loan.  The notation Blasini included on Consuelo
Garca-Gomez's loan application, "discussed and agreed to by
attorney R.L. Coln," provided ample evidence from which the jury
could infer that Coln was personally involved in the illegal
transaction with Consuelo Garca-Gomez, just as he had been
personally involved in arranging the loans to other members of the
Usera family with the help of Blasini.  This wrongful use of bank
money to satisfy a private debt, carried out with an intent to
deceive the bank about the true nature of the transaction, involved
all of the essential elements of the crime of misapplication.    
 On appeal, Coln argues that Blasini's notation on
Consuelo Garca-Gomez's loan document did not appear until a month
after the loan was processed, and hence there was insufficient
evidence of his involvement in the loan.  We disagree.  The jury
could have reasonably concluded that Blasini accurately recorded
Coln's contemporaneous involvement in the loan even if Blasini's
notation was subsequent in time.  Considering the totality of the
circumstances, there was sufficient evidence to convict Coln for
the misapplication of bank funds on Count Six.
B. Bank fraud (Count Seven)
 To establish bank fraud pursuant to 18 U.S.C.  1344,
the government must establish that the defendant (1) engaged in a
scheme or artifice to defraud or made false representations to
obtain money from (2) a financial institution and (3) did so
knowingly.  A scheme or artifice to defraud is defined to include
"any plan, pattern or [course] of action . . . intended to deceive
others in order to obtain something of value."  United States v.
Brandon, 17 F.3d 409, 424 (1st Cir. 1994) (quoting United States v.
Goldblatt, 813 F.2d 619, 624 (3d Cir. 1987)).  The evidence was
sufficient for the jury to conclude that Coln, with the assistance
of Blasini, knowingly engaged in a scheme to obtain bank funds,
deceitfully characterized as a loan, to satisfy $100,000 of his
outstanding obligation to Consuelo Garca-Gomez.  The structuring
of the transaction as a loan was the scheme to defraud.  Further,
as with the misapplication count, the notation on the back of the
loan documents sufficiently demonstrates Coln's specific
involvement in the sham loan transaction.  
 After Coln was sentenced and his appeal submitted to us,
the Supreme Court determined that materiality is an element of the
fraud perpetrated by "a scheme or artifice" under 18 U.S.C.  1344.  
See Neder v. United States, 119 S. Ct. 1827, 1839 (1999).  Not
having had the benefit of Neder, the district court did not
instruct the jury that in order to convict it had to find that the
"scheme or artifice to defraud" involved material falsehoods.  
Because this rule was announced while Coln's conviction was on
direct appeal, the newly-announced rule applies to his appeal.  See
Griffith v. Kentucky, 479 U.S. 314, 328 (1987) (holding that "a new
rule for the conduct of criminal prosecutions is to be applied
retroactively to all cases, state or federal, pending on direct
review or not yet final, with no exception for cases in which the
rule constitutes a 'clear break' with the past").  We review the
district court's omission of the materiality element for plain
error because Coln did not claim that materiality was an element
before the district court.  See Johnson v. United States, 520 U.S.
461, 465-66 (1997).  We apply this standard even though there has
been a change in the law since trial and defense counsel's failure
to object was appropriate at the time.  See id.; see also United
States v. Collins, 60 F.3d 4, 7 (1st Cir. 1995) (applying plain
error review to claim raised for the first time on appeal even when
failure to object "most likely was based on counsel's correct
understanding of the law at the time").
 Before we can correct an error pursuant to the plain
error standard, we must conclude that there was error, that the
error was plain and that the error affected substantial rights.
Johnson, 520 U.S. at 466-67 (citing United States v. Olano, 507
U.S. 725, 732 (1993)).  If these three conditions are met, we "may
then exercise [our] discretion to notice a forfeited error, but
only if the error . . . seriously affect[s] the fairness,
integrity, or public reputation of judicial proceedings." Id. at
467 (internal quotation marks omitted).  
 In light of Neder, there is no doubt that the court's
instruction on bank fraud, omitting any reference to materiality,
was an error and that such error was plain.  In Johnson, the
Supreme Court held that where the law at the time of trial is
contrary to the law at the time of the appeal, "it is enough that
an error be 'plain' at the time of appellate consideration." Id. at
468.
 The requirement under Rule 52(b) that the plain error
"affect substantial rights" has been interpreted to mean that "the
error must have been prejudicial: It must have affected the outcome
of the district court proceedings."  Olano, 507 U.S. at 734.  This
standard is substantially the same as the standard applied in a
harmless error analysis under Rule 52(a), except that "[i]t is the
defendant rather than the Government who bears the burden of
persuasion with respect to prejudice."  Id.  Coln's deception
about the sham loan to Consuelo Garca-Gomez was material in the
relevant sense, i.e., a "reasonable man would attach importance to
[it] in determining his choice of action in the transaction in
question." Neder, 119 S. Ct. at 1840 n.5 (quoting Restatement
(Second) of Torts  538 (1976)).  Officials at the bank reviewing
this transaction would undoubtedly be influenced in their view of
its appropriateness by Coln's deception about Consuelo Garca-
Gomez's demand for payment of his overdue debt.  At the very least,
Consuelo Garca-Gomez's anger about Coln's ploy, described by
witnesses at the trial, created the risk that she would refuse to
treat the loan transaction contrived by Coln as a loan.  Coln's
deception about the purpose of the loan to Consuelo Garca-Gomez
was inescapably material, and hence, like the Supreme Court in
Neder, we conclude beyond a reasonable doubt that the jury verdict
on the bank fraud count would have been the same even if the court
had given an instruction on materiality.
C. False entry (Count Eight)
 Coln was charged with making a false entry with the
intent to defraud a banking institution in violation of  1006.  
The statute provides that any employee of an insured bank who makes
a false entry in any statement to such institution with the intent
to defraud such institution commits a violation. See 18 U.S.C.
1006.  In Blasini, we assumed arguendo that materiality is an
element of the crime of false entry and concluded that there was
sufficient evidence for a reasonable jury to decide that Blasini
had made a material false entry on Consuelo Garca-Gomez's loan
application by stating to Marisel Marrero, the bank officer who
prepared the documentation for Consuelo Garca-Gomez's loan, that
the purpose of her loan was the purchase of an apartment.  See
Blasini, 169 F.3d at 66.
 Coln did not fill out Consuelo Garca-Gomez's loan
application, nor was he present when the notation was made on the
document.   This absence of direct participation by Coln does not
end the analysis, however.  Coln and Blasini were charged with
aiding and abetting each other in making a false entry on a loan
document. A defendant is guilty of aiding and abetting where the
government can show that (1) "the principal committed the
underlying substantive crime" and (2) "the defendant associated
himself with the venture, participated in it as something he wished
to bring about, and sought by his actions to make it succeed."
United States v. Loder, 23 F.3d 586, 590-91 (1st Cir. 1994).  "It
is well settled that a culpable aider and abetter need not perform
the substantive offense, be present when it is performed, or be
aware of the details of its execution."  United States v. Garca-
Rosa, 876 F.2d 209, 217 (1st Cir. 1989), vacated on other grounds
sub nom. Rivera-Feliciano v. United States, 498 U.S. 954 (1990).  
Moreover, the government "need not preclude every reasonable
hypothesis in order to sustain a conviction," and may prove its
case through circumstantial evidence. Loder, 23 F.3d at 591.  
 Accordingly, even though Blasini actually caused the
making of the false entry on the loan application about the
apartment, Coln too may be punished for false entry if he is
guilty of aiding and abetting Blasini in that effort.  The
transaction with Consuelo Garca-Gomez on April 19, 1988, was
unusual.  Marisel Marrero, the assistant bank manager, testified
that she could not recall a $100,000 loan that was disbursed the
same day the loan application was received.  That application
process began with a handwritten loan application for which Blasini
provided the information.  That information included the statement
that the purpose of the loan was the purchase of an apartment.  
This handwritten copy was then typed up.  Apparently there was a
problem with the review of the loan documentation within the bank,
and the loan department sent the file back on May 9 for further
documentation, including an indication of Blasini's approval of the
loan.  On May 11, an unidentified bank official responded with a
written memorandum indicating that the loan had been approved by  
Blasini on April 19, orally and by signature, and that the original
documents were being sent to him to sign.  According to Coln, the
document with the comment by Blasini asserting that the loan with
Consuelo Garca-Gomez had been "discussed and agreed to by attorney
R. L. Coln" was not received back at the loan department until
May 17.
 Although there is uncertainty in the record about
precisely when Blasini added the notation about the discussion with
and agreement of Coln, we have already noted that a jury could
have reasonably concluded that Blasini accurately recorded Coln's
contemporaneous involvement in the loan with Consuelo Garca-Gomez
even if Blasini's notation was subsequent in time.  A jury could
further infer that the false entry had been specifically discussed
with Coln for three reasons.  The bank form for the loan required
that a statement of purpose be given for a loan of this size.  It
is a fair inference that Coln, as president of the bank, was aware
of that requirement.  Secondly, this purported loan to Consuelo
Garca-Gomez was in fact a sham transaction, designed to pay off a
portion of Coln's debt to Garca-Gomez.  That purpose obviously
could not be stated.  Coln and Blasini would have anticipated the
need to contrive some other statement of purpose.  Third, the
notation is on the second page of a document containing the false
entry and it is reasonable to conclude that Blasini and Coln
discussed that same document.  Under these circumstances, a
reasonable jury could conclude beyond a reasonable doubt that Coln
associated himself with Blasini in the venture to make a false
entry on Consuelo Garca-Gomez's loan application and that he
sought by his actions to make this illegal act succeed.  See United
States v. Loder, 23 F.3d 586, 590-91 (1st Cir. 1994).
D. Fraudulently benefitting from a loan (Count Nine)
 Coln claims that there was insufficient evidence from
which a jury could convict him of improper participation in the
loan to Consuelo Garca-Gomez in violation of  1006.  To convict
on this crime, the government must demonstrate "(1) the defendant's
connection with a protected institution; (2) direct or indirect
receipt of some benefit from a bank transaction; and (3) intent to
defraud." United States v. Brechtel, 997 F.2d 1108, 1115 (5th Cir.
1993).  In Brechtel, the court explained that "a fiduciary who
benefits . . . by knowingly subordinating the institution's
interests to his own in a transaction for which he has
responsibility acts with the 'intent to defraud' required by  
1006." Id. at 1116.  The government can demonstrate an intent to
defraud through circumstantial evidence.  See id.  "An inference of
intent to defraud arises where a responsible bank insider acts to
procure a transaction which he knows will benefit him, without
disclosing his interest therein." Id.
 As President of the bank, Coln was obviously connected
with the financial institution.  The sham loan to Consuelo Garca-
Gomez was of great benefit to him.  His debt to her was outstanding
and he was able to use bank funds to make a partial payment to her.  
His prior involvement with the family and the notation on the back
of the loan document demonstrate his involvement in the transaction
even though he was not present at the time the loan was signed.  As
noted in Brechtel, a jury may infer Coln's attempt to defraud the
bank from the fact that he acted to "procure a transaction which he
[knew would] benefit him, without disclosing his interest therein"
to the bank.  Id. at 1116.  There was sufficient evidence to
support his conviction for fraudulently benefitting from the loan
to Consuelo Garca-Gomez in violation of  1006.    
E. False statement (Count Eleven)
 Coln was convicted of making a false statement in
violation of 18 U.S.C.  1014 relating to the $500,000 loan he
obtained from Royal Bank in 1988.  In order to convict for a
violation of 18 U.S.C.  1014 in this context, the government must
prove that 1) the defendant made or caused to be made a false
statement or report to a bank in a loan application, 2) that the
defendant acted knowingly and 3) that the false statement was made
for the purpose of influencing the bank's actions on the loan.  See
United States v. Concemi, 957 F.2d 942, 951 (1st Cir. 1992).  The
false statement need not be material, see United States v. Wells,
519 U.S. 482, 489-99 (1997), but the statement must be "for the
purpose of influencing in any way the action of the [bank]."  18
U.S.C.  1014.   
  The government alleged that Coln made a false statement
on a mortgage deed to the farm that was filed at the registry of
deeds on April 19, 1988, one month prior to the issuance of the
$500,000 loan.  The mortgage deed did not mention the Usera's
existing mortgage on the farm, stating instead that Royal Bank was
granted a first mortgage on the farm.   By way of defense, Coln
argues that the statement on the deed was not intended to display
the "contents [as if they] were necessarily then already true, but
for use at closing."   He maintains that there was insufficient
evidence from which a jury could reasonably conclude that the
statement (even if false) was made for the purpose of influencing
the actions of Royal Bank.  We agree.
 On April 15, 1988, Juan Vicens, the vice president of
Royal Bank, received a phone call from Coln requesting a $500,000
one-year loan.  Coln offered a mortgage note on the farm as
collateral for the loan.  In a follow-up letter from Coln on April
18, Coln confirmed that he had requested the loan, "[o]ffering you
as collateral a first mortgage note corresponding to a four hundred
sixty-three point nine eight one seven 'cuerda' property . . . .
Should the loan be approved as I expect, I will deliver the
promissory note for seven hundred thousand dollars as collateral at
the time of signing."   The next day, April 19, Coln registered a
mortgage deed on the farm granting Royal Bank a first mortgage on
the property.  However, in the financing statement prepared by
Coln's certified public accountant, and dated April 27, the Usera
family's pre-existing mortgage was fully disclosed.  The financing
statement was submitted to Royal Bank as part of Coln's loan
application.  On May 3, 1998, Vicens prepared a letter to the
Bank's credit department, recommending approval of the loan.  In
the letter, Vicens stated that Coln requested the loan "for the
purposes of paying a debt which resulted from the purchase of
property offered as collateral."  The loan was approved on May 4.  
On May 13, Coln satisfied his obligations to the Usera family and
the Usera family released their own first mortgage on the property.  
Three days later, on May 16, Coln signed the pledge contract at
Royal Bank and obtained a check for the net amount of the $500,000
loan.   
  At trial, Vicens testified that he did not recall Coln
telling him that the Usera's had a pre-existing mortgage on the
property, but he specifically noted that "to me the important thing
was that the day the loan was to be executed, that the property
have the rank of a first mortgage."  Coln fully disclosed the
presence of the pre-existing mortgage in the financing statement.  
As Vicens testified on cross-examination, although he did not
recall Coln informing him of the pre-existing mortgage verbally,
"it's clear from this document that [the pre-existing mortgage] is
mentioned on the financial statement."  He further explained that
the bank relies on the financing statement to make decisions
regarding the disbursement of monies and that they are critical in
determining the creditworthiness of the individual.  Moreover, in
the actual letter recommending that the bank approve the loan,
Vicens clearly stated that Coln needed the loan to pay off debt on
the property that would be serving as collateral for the $500,000
loan.  
 Under these circumstances, no reasonable jury could find
that the statement in the mortgage deed that Royal Bank had a first
mortgage on the property was made for the purpose of influencing
the bank to disburse a loan that the bank would not have otherwise
made.  To the contrary, that mortgage deed was filed in the public
registry in anticipation of a loan closing with Royal Bank where
Royal Bank would receive a first mortgage on the registry.  Coln's
loan application to the bank fully disclosed the presence of the
Usera mortgage which would have to be discharged before Royal Bank
obtained its first mortgage.
F. Conspiracy (Count One)  
 When charging conspiracy under 18 U.S.C.  371, the
government must prove that  "the particular defendant and at least
one other person expressly or tacitly agreed to commit a federal
offense."  United States v. Josleyn, 99 F.3d 1182, 1190 (1st Cir.
1996).  Further, the government must show that the defendant
voluntarily participated in the conspiracy and that an overt act
took place in furtherance of the conspiracy.  Blasini, 169 F.3d at
67.  The defendant need not be familiar with "all the details of
the conspiracy," Josleyn, 99 F.3d at 1190, nor must the government
prove the conspiratorial agreement or the defendant's participation
in the agreement by direct evidence.  See Blasini, 169 F.3d at 67.
 Coln argues on appeal that we cannot affirm his
conviction on the conspiracy count because the only evidence that
connected him to the loan to Consuelo Garca-Gomez was the
handwritten notation by Blasini that the loan had been "discussed
and agreed to by attorney R. L. Coln."  Because this notation was
allegedly written at a date following the actual transaction, the
jury could not have concluded that he was involved in this
transaction.  For many of the reasons already stated, we disagree.  
 Contrary to Coln's contentions, the jury was not
required to divorce the transaction with Consuelo Garca-Gomez from
Coln's transactions with the other members of the Usera family.  
Although we concluded that there was insufficient evidence to
establish the criminality of those other transactions, we also
noted that Coln and Blasini were "playing it close to the line" in
those dealings.  Blasini, 169 F.3d at 67.  Coln's personal
involvement in those transactions adds considerable significance to
the notation "discussed and agreed to by attorney R.L. Coln,"
permitting a reasonable jury to conclude that Coln and Blasini,
already working together on the prior transactions, had agreed to
use bank funds to enable Coln to satisfy his delinquent debt to
Consuelo Garca-Gomez in violation of federal law, and that Coln
and Blasini committed overt acts in furtherance of the conspiracy.  
Despite Coln's protests, it was for the jury to evaluate the
importance of the notation on the loan document, regardless of the
date that the notation was made, and all of the other evidence of  
Coln's collaboration with Blasini. We affirm the conspiracy
conviction.
IV. Forfeiture (Count Twelve) and the Ex Post Facto Clause
 Count Twelve of the indictment alleged that the farm was
subject to forfeiture pursuant to 18 U.S.C.  982(a)(2)(A).  Coln
argues that the Ex Post Facto Clause, U.S. Const. art. I,  9, cl.
3, which prohibits the application of a law in a criminal
proceeding where it would inflict "a greater punishment, than the
law annexed to the crime when committed," Calder v. Bull, 3 U.S. (3
Dall.) 386, 390 (1798), barred the forfeiture of the farm because
at the time the alleged crimes were committed, the statute did not
allow for forfeiture as a penalty for the pertinent banking
provisions.  
 On August 9, 1989, 18 U.S.C.  982 was amended to add
certain banking offenses (or conspiracy to commit such offenses) to
the list of possible grounds for a criminal forfeiture. See Pub. L.
No. 101-73,  963(c)(1), 103 Stat. 183, 504-05 (1989). Among the
provisions newly included as grounds for forfeiture were  657,
1006, 1014, and 1344, violations of which were alleged in the
indictment as the object of the Count One conspiracy. See id. In
this case, although the indictment alleged that most of the overt
acts committed in furtherance of the conspiracy were committed
prior to August 9, 1989, it did include an allegation concerning
events occurring in August of 1990.  On the basis of the 1990 acts,
the government included a count under the criminal forfeiture
statute to take possession of the farm.   
 In order to resolve the Ex Post Facto issue we must
determine the scope of the conspiracy between Coln and Blasini
established by the evidence, "for it is that which determines both
the duration of the conspiracy and whether the act relied on is an
overt act which may be properly regarded as in furtherance of the
conspiracy."  Grunewald v. United States, 353 U.S. 391, 397 (1957).  
The government must "prove that the conspiracy, as contemplated in
the agreement as finally formulated, was still in existence on [the
relevant date] and that at least one overt act in furtherance of
the conspiracy was performed after that date." Id. at 396.
 The government described the object of the conspiracy in
Count I as follows:
   It was the object of the conspiracy that the
 defendants and coconspirators, and others to
 this Grand Jury known and unknown, would
 misapply or cause to be misapplied funds
 entrusted to or in the custody of the Ponce
 Federal Bank, F.S.B., by means of false
 statements, representations and pretenses, to
 Ponce Federal Bank, F.S.B. and the Royal Bank
 de Puerto Rico, for the purpose of permitting
 Ramiro L. Coln Muoz and his wife to purchase
 and ultimately pay, a farm known as "La
 Esmeralda Nmero Uno" with loans obtained from
 the Ponce Federal Bank, F.S.B., and the Royal
 Bank de Puerto Rico.

The government cites two overt acts "whose close interrelation
extended the conspiracy beyond August 9, 1989, thus excepting the
instant case from the application of the Ex Post Facto [C]lause."
Those overt acts are:
   9. On May 16, 1988, Ramiro L. Coln-Muoz
 obtained a loan for Five Hundred Thousand
 Dollars ($500,000.00) from Royal Bank de
 Puerto Rico, using "La Esmeralda" as
 collateral, a loan which he eventually paid
 off with funds belonging to Ponce Federal
 Bank, F.S.B.

   10. On August 10, 1990, Ramiro L. Coln-Muoz
 paid to the Royal Bank de Puerto Rico
 approximately Three Hundred Eighty-Nine
 Thousand Seven-Hundred [sic] Thirty Dollars
 and Seventy-Six Cents ($389,730.76) by means
 of wire transfer in order to cancel the
 balance due on the Five Hundred Thousand
 Dollars ($500,000.00) loan from Royal Bank de
 Puerto Rico.

Although the May 16, 1988 loan from Royal Bank was obtained prior
to enactment of the forfeiture provision on August 9, 1989, the
government argues that repayment of that loan on August 10, 1990,
subsequent to enactment of the forfeiture provision, justifies the
application of that provision.  We disagree.
 The evidence on the conspiratorial agreement between
Coln and Blasini was largely circumstantial, involving evidence of
the Ponce Bank transactions with the members of the Usera family in
which Coln and Blasini participated together. That evidence proves
a conspiracy between Coln and Blasini to misapply Ponce Federal
Bank's funds in satisfaction of Coln's debt to Consuelo Garca-
Gomez for the purchase of La Esmeralda.  The goal of this
conspiracy was realized on May 13, 1988 when Coln paid his
indebtedness to the members of the Usera family, including Consuelo
Garca-Gomez, partly with overdrafts on his personal account at the
Ponce Bank, and obtained a release of their mortgage on the farm.  
There is no evidence that the repayment of the Royal Bank loan on
August 10, 1990 was an overt act in furtherance of the conspiracy
between Coln and Blasini.
 A conspiracy does not continue indefinitely simply
because the fruits of the conspiratorial objective continue into
the future. See United States v. Doherty, 867 F.2d 47, 61 (1st Cir.
1989) (holding that continuing salary payments for officers who
received promotions (the object of the conspiracy) did not extend
the conspiracy because salary payments, without more, are best
understood as the 'result' of the conspiracy).  As the Supreme
Court has noted:
   Though the result of a conspiracy may be
 continuing, the conspiracy itself does not
 thereby become a continuing one.  Continuity
 of action to produce the unlawful result, or
 . . . continuous cooperation of the
 coconspirators to keep it up, is necessary.

Fiswick v. United States, 329 U.S. 211, 216 (1946) (internal
quotation marks omitted).  Coln's repayment of his Royal Bank loan
is analogous to the continued receipt of increased salary as the
result of the fraudulently obtained promotions at issue in Doherty.  
Where "the payoff [of a conspiracy] merely consists of . . .
ordinary, typically noncriminal, unilateral actions, . . . and
there is no evidence that any concerted activity posing the special
societal dangers of conspiracy is still taking place, we do not see
how one can reasonably say that the conspiracy continues."  
Doherty, 867 F.2d at 61.
 Although the government alleges that payments made after
August 9, 1989 "were the last stages through which [Coln]
attempted to fulfill the object of the conspiracy to ultimately pay
for a farm known as 'La Esmeralda,'" this statement defines the
conspiracy more broadly than the evidence can sustain.  There is no
allegation that Coln's repayment of the Royal Bank loan was itself
illegal or that it involved the type of concerted activity through
which conspiracies pose "special societal dangers."  See id.  The
government's theory of the case would encompass any subsequent re-
financing of Coln's payment for La Esmeralda, however legitimate,
as furthering the conspiracy.  To the extent that Coln continued
in his efforts to complete payment on the loan he had received from
Royal Bank and did so on August 10, 1990, those were his acts alone
and not part of the conspiracy with Blasini to use Ponce Bank funds
to purchase La Esmeralda.  The application of forfeiture to the
farm on the basis of the conspiracy charged in Count One of the
indictment violates the Ex Post Facto Clause of the Constitution.
V. Evidentiary Objections
 Coln claims that two evidentiary rulings at trial denied
him a fair trial and warrant a reversal of the convictions and a
new trial.  We disagree.   
 At trial, the government introduced evidence that the
Board of Directors of Ponce Federal Bank unanimously awarded Coln
a $615,500 retirement package in 1990.  Bank officials further
testified that, seven months after he was awarded the severance
package, Coln agreed to return the monies to Ponce Federal Bank
for undisclosed reasons, and he pledged La Esmeralda as a guarantee
for the return of the severance package (on which interest was
still due at the time of trial).  That is the extent of the
severance pay evidence.  There was no testimony relating to the
legality or appropriateness vel non of the severance package, other
than evidence that the bank's legal counsel had approved it.
 Coln claims that the evidence was irrelevant and that,
even if relevant, it was unfairly prejudicial.  The government
argues that this evidence was probative of an overt act in
furtherance of the conspiracy   Coln's re-payment of his debt to
Royal Bank in August 1990.  We have rejected this theory of the
conspiracy, discussed supra.  Given that the conspiracy did not
extend to the repayment of the Royal Bank loan in August 1990, we
cannot accept the proposition that evidence of his severance
package and its return was relevant to proving the existence of the
conspiracy.  However, we conclude that any error in the
introduction of this evidence was harmless.
 In reviewing for harmless error, we "ask whether the
result would have been the same if the disputed evidence had not
been admitted.  We have therefore said that a conviction will be
upheld if it is 'highly probable' that the result would have been
the same." United States v. Vigneau, No. 98-1632, 1999 WL 508809,
at *2 (1st Cir. July 22, 1999) (quoting United States v. Cudlitz,
72 F.3d 992, 999-1000 (1st Cir. 1996)).  The severance package
evidence was remote in time from the other charges, ambiguous, and
briefly stated.  The Useras were paid in May 1988; Coln's
retirement and the severance package events did not transpire until
August 1990.  The testimony on the severance package did not
establish any wrongdoing on Coln's part.  It did not relate
factually to any of the convictions we affirm.  We are convinced,
therefore, that it is highly probable that the results in this
trial would have been the same without the admission of the
disputed evidence and we hold that its admission was harmless.  
 Coln's second objection concerns the introduction of
evidence of Blasini's apparent attempt to influence a witness prior
to trial.  During the government's rebuttal case, Marisel Marrero
testified that Blasini approached her prior to trial and suggested
that she might not recall the events at issue because they occurred
so long in the past.  The evidence was admitted as rebuttal
evidence to refute Blasini's character evidence.  Before the
evidence was put before the jury, the court told the jury that it
was not to consider Marrero's testimony "in any manner" as to
Coln. In its final instructions to the jury, the court again
informed the jury that it was not to consider this testimony in
evaluating the government's case against Coln.  Although Coln
argues that the introduction of this evidence was unfairly
prejudicial, any risk of prejudice was cured by the court's
limiting instruction.   "We must presume that jurors, conscious of
the gravity of their task, attend closely the particular language
of the trial court's instructions in a criminal case, and that they
follow those instructions." United States v. Smith, 145 F.3d 458,
462 (1st Cir. 1998) (internal quotation marks omitted).  The court
carefully instructed the jury on two occasions that it was not to
consider the evidence about Blasini's dealings with Marrero against
Coln.  The admission of this evidence did not deny Coln a fair
trial.
VI. Conclusion
 Although Coln challenges the court's enhancement of his
sentence for his "leadership role," we do not address that argument
because resentencing will be required in light of our disposition
of this appeal.  In summary, that disposition is the following:
 The judgment is AFFIRMED on counts One, Six, Seven, Eight
and Nine; VACATED on counts Two through Five, Eleven and Twelve.  
Upon remand, the district court shall enter a judgment of acquittal
on counts Two through Five, Eleven and Twelve and shall re-sentence
on the remaining convictions in light of this decision.

</body>

</html>